UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

MICHAEL MCLENNON AND
RICHARD CAMPBELL

      PLAINTIFFS

   -AGAINST-

NEW YORK CITY, POLICE OFFICER
VORRARO, DETECTIVE GALASSO,
DETECTIVE RUSSO, DETECTIVE
STEVEN DELUCA, DETECTIVE PHILIP
MATHEW, DETECTIVE DANIEL
HERNANDEZ, SERGEANT BEATTY,
LIEUTENANT KAISER, DETECTIVE ALAMONTE
OFFICERS JOHN DOE 1-5, and NEW YORK CITY
POLICE DEPARTMENT

      DEFENDANTS
_____

AMENDED VERIFIED
COMPLAINT

JURY DEMAND

Michael McLennon and Richard Campbell, through their attorney, Tamara M.

Harris, hereby allege as follows:

## MALICIOUS PROSECUTION AND FALSE ARREST UNDER 42 USCS § 1983

1.     Plaintiffs Michael McLennon and Richard Campbell resided at 191-20

       110 Road, St. Albans, New York on September 25, 2007 in a private

       residence.

2.     Prior to September 25, 2007 Winston Dixon and his son, Rasheel Dixon,

       resided in that home as tenants in the basement.

3.     The Dixons had moved out prior to September 25, 2007.

4.      Despite vacating the premises, Winston and Rasheel Dixon has been
        returning to the home of Michael McLennon and Richard Campbell with
        threats of violence, even breaking into the plaintiff's home on September
        23, 2007.

5.      Despite these prior threats of violence, and the plaintiffs' family notifying
        the police that they were afraid the Dixons would return to cause harm to
        them, the police failed to take any action to rectify the situation.

6.      The situation escalated on September 25, 2007 when Rasheel and Winston
        Dixon returned to the plaintiffs' residence armed with a fifteen inch
        butcher knife, clothed in a hand-made knife sheeth.

7.      Winston Dixon and Rasheel Dixon provoked a physical altercation with
        plaintiffs, at which point Winston Dixon drew his fifteen inch butcher
        knife, concealed in its homemade sheeth, from his waistband, and charged
        at Michael McLennon in an attempt to stab him.

8.      Winston Dixon and his son, Rasheel Dixon, chased Michael McLennon
        into his own home, and entered that home while trying to stab Michael
        McLennon

9.      While inside of the residence, Rasheel Dixon grabbed Michael McLennon
        and tried to hold him so that his father, Winston Dixon, could thrust the
        knife into McLennon.

10.     During a struggle to free himself of Rasheel Dixon's grasp, Winston
        Dixon stabbed Michael McLennon after having invaded and entered said

residence with the intent to commit a crime therein, with the assistance of his son; to wit murder.

11.    Michael McLennon retrieved a gun from underneath his living room couch and, as Winston Dixon loomed above him with knife in hand ready to stab Michael McLennon, Michael McLennon shot Winston Dixon in self-defense.

12.    Winston Dixon, who was still thrashing with his knife after being shot, accidentally stabbed his son, Rasheel, in the hand, with the knife, while inside the McLennon home.

13.    Richard Campbell dove into the house upon hearing bullets being fired as he entered the residence.

14.    Winston Dixon and Rasheel Dixon, bled in the interior of the house as a result of their wounds, leaving a blood trail in the foyer/living room area of the house, portions of the wall and the doorway.

15.    Rasheel ran out of the house leaving blood trails leading from the interior of the McLennon residence to the outside of the residence.

16.    Winston Dixon dragged himself out of the McLennon residence with his knife, leaving a blood trail in the interior of the home and onto the exterior of the home, in the vicinity of the porch.

17.    As police arrived, Dixon tossed his knife into a bush on the side of the porch to conceal the evidence of his attempt to murder Michael McLennon within Michael McLennon's own home.

18.    An independent witness, who later turned out to be a confidential informant for the NYPD, witnessed the incident and advised police that he had observed Winston Dixon pull out a machete and chase Michael McLennon into the home, at which point he heard gunshots within the home, after Winston and Rasheel had already forced their way in at knifepoint. The confidential informant indicated he never saw either Michael McLennon or Richard Campbell fire shots from a gun outside the home.

19.    The police knew of the exculpatory information of the confidential informant; to wit, that defendants never fired any weapons outside of their home and that Winston Dixon was the initial aggressor-chasing McLennon into his own home at knifepoint.

20.    The police knew that in order to build a case upon which a murder conviction could be obtained, that they would need to produce evidence that the shooting of Winston Dixon took place outside the McLennon home, in order to avoid an acquittal based on self defense within the home.

21.    All named defendants worked together to acquire evidence that would build a case of a shooting outside the home, so as to avoid an acquittal based on self defense within the home.

22.    All named defendants worked together to conceal all exculpatory evidence that would substantiate a self defense shooting within the McLennon and Campbell residence by doing the following: refusing to voucher the blood

stained carpet from the McLennon home that would have substantiated Winston Dixon was shot within the home in self-defense; ignoring the exculpatory nature of the butcher knife recovered in a bush near Winston Dixon; willfully refusing to photograph blood within the McLennon and Campbell home on the walls, carpet and furniture under the pretense that there was no blood within the home consistent with self-defense; willfully losing exculpatory physical evidence to prevent its later disclosure at trial, including Richard Campbell's sweatshirt, blue jeans and t-shirt- which would have proven he was not the shooter due to the absence of gunpowder residue; willfully refusing to take gunshot residue tests of Richard Campbell, to avoid having confirmation that their arrest of him as a second shooter was baseless; willfully ignoring ballistics evidence confirming that there was only one shooter and that McLennon and Campbell could not both have fired weapons; lying to the DA's Office about the presence of blood in the house (by claiming there was no blood in the house) in order to enable the prosecutor to argue for remand status and high bail with the respective plaintiffs; willfully lying to the grand jury by claiming their was no blood in the house so as to defeat the grand jury instruction on self defense within the home and assist in obtaining an indictment and conviction; lying at suppression hearings regarding the absence of blood in the home; and lying at trial about the absence of blood in the home. All of this fabrication and unlawful conduct of the defendants

was done with the goal of hiding the extreme weaknesses in the case against plaintiffs and to ensure a conviction.

23.     The arresting detective Steven Deluca, with the aid of all named defendants, concealed the exculpatory nature of what the confidential informant told them (namely, that neither of the plaintiffs fired any shots outside the home and he heard shots from within the home after the Dixons chased McLennon into his own home at knifepoint) and lied to the Queens District Attorney's Office Intake Bureau by claiming that the confidential informant witnessed plaintiffs firing their guns outside the home.

24.     Defendant Deluca and all other investigating officers, detectives, sergeants,and lieutenants named as defendants in this case knew of the existence of this confidential informant witness, knew the content of what his true testimony would be, and willfully misrepresented the content of his observations to the Queens District Attorneys Office to make the criminal case against Michael McLennon and Richard Campbell appear stronger than it actually was and to ensure the conviction of two innocent men.

25.     Richard Campbell advised the police, including but not limited to Officer Vorraro, Detective Galasso, Detective Steven Deluca,  Detective Bendig, and Detective Alamonte that his brother had shot Winston Dixon only after Dixon invaded their home wielding a long knife with a white handle and that the shooting happened inside the house in self-defense.

26.     Officer Vorraro, in addition to hearing Richard's statement of what
        transpired, observed the knife in the bush that Winston Dixon had tossed,
        corroborating what Richard had told him. Officer Vorraro and all other
        named defendants disregarded the exculpatory nature of this evidence
        when charging defendants with attempted murder, murder, manslaughter
        and assault in the first degree.

27.     Detectives Galasso, Detective Russo, Detective Steven Deluca, Detective
        Philip Mathew, Detective Bendig, Detective Alamonte, Detective Daniel
        Hernandez, and Sergeant Beatty all entered the house and observed fresh
        blood on the carpeting, furniture, wall, and doorway, substantiating
        plaintiff Campbell's claim of self-defense.

28.     Shell casings were found inside the house in the living room and dining
        room, evidencing a shooting having taken place within the residence, and
        substantiating plaintiff Campbell's claim that McLennon shot Dixon in
        self defense within McLennon's own home..

29.     Despite observing 1.blood in the home, 2. Winston Dixon's butcher knife
        in a bush,3. the sheeth for the knife outside the residence, 4. the written
        statement of Richard Campbell that the shooting took place in the home in
        self defense-after Winston Dixon invaded the home at knifepoint,5.  the
        statement of a confidential informant that Winston Dixon was shot in the
        home after forcing his way in at knifepoint and trying to stab Michael
        McLennon inside of Michael's own residence- the police willfully and

maliciously disregarded and lied about the existence of all exculpatory evidence in order to build a seemingly stronger case.

30.    The police then charged plaintiffs with attempted murder, and then murder in the second degree, manslaughter, and assault in the first degree,  after taking great measures to build a case on a fictitious theory that Michael McLennon and Richard Campbell both engaged in an unprovoked shooting of two unarmed men outside their home, so that plaintiffs could not avail themselves of a justification defense.

31.    All named defendants, including but not limited to Detective Galasso, Detective Russo, Officer Vorraro, Detective Steven Deluca, Detective Philip Mathew, Detective Daniel Hernandez, Sergeant Beatty, Detective Bendig, Lieutenant Kaiser, Detective Alamonte unlawfully searched the McLennon home on September 25, 2007 prior to obtaining a search warrant.

32.    During the course of that illegal search police allegedly found two guns within the home, a stun gun, ammunition and blood. The police photographed the guns and other physical evidence discovered during their warrantless and unlawful search of the inside of the McLennnon and Campbell residence.

33.    Knowing that there was physical and forensic evidence in the home prior to obtaining a search warrant, and having photographed the same,  the above named defendants concealed the fact that they had already discovered evidence of guns in the home during an illegal search.

34.    Defendants, with the knowledge they had conducted an unlawful
warrantless search of the McLennon/Campbell home, were anxious to use
the tainted evidence they seized from the McLennon home unlawfully in a
criminal prosecution and to initiate a criminal prosecution based on that
tainted evidence.

35.    All named defendants concealed their unlawful search and sought to hide
their tainted search and their seizure of tainted evidence by subsequently
applying for a search warrant under the pretense they had no actual
knowledge of what was inside the McLennon home.

36.    Detective Galasso, acting in concert with the other above named
defendants then submitted a false and perjurious affidavit to a judge of the
Queens Supreme Court seeking a search warrant under the pretense that
the police believed there may be blood, guns, and other evidence within
the McLennon/Campbell home due to the evidence they discovered while
outside of the McLennon home.

37.    Detective Galasso willfully lied to the judge issuing the search warrant by
pretending to seek a warrant based on evidence visualized outside of the
McLennon home, when in reality he knew of the existence of this
evidence as a direct result of an illegal and warrantless search of plaintiff's
home before obtaining the search warrant.

38.    At the time Detective Galasso applied for a search warrant, and at the time
Detective Galasso submitted an affidavit for the search warrant, he knew
the evidence had already been seized unlawfully without a warrant, that

the affidavit he submitted in support of the search warrant was false, and that he should not have applied for search warrant after having already conducted an illegal search.

39.    Any reasonably well trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

40.    Detective Galasso's application for the search warrant was not objectively reasonable, because it created an unnecessary danger of unlawful arrest.

41.    Plaintiffs discovered that all named defendant, including Detective Galasso, Detective Mathew, Detective Hernandez, Sgt. Beatty, Lt. Kaiser, as well as all other named defendants had unlawfully searched their home before executing a search warrant during a suppression hearing that was conducted on or about November 3, 2010.

42.    During the suppression hearing on or about November 3, 2010 defendant Detective Philip Mathew testified. During the course of that suppression hearing it was disclosed through the testimony of Detective Philip Mathew that photographs of the evidence recovered from within the McLennon residence were submitted to the NYPD photo lab at approximately 8:35pm on September 25, 2007, which was before police execute the search warrant- proving an unlawful and warrantless search took place before the police obtained an actual search warrant. Upon verifying his handwriting on an NYPD photo lab receipt dated September 25, 2007 at 8:35pm, it

became apparent Mathew's testimony would result in suppression of the physical evidence.

43. To avoid suppression of the prosecution's evidence, on or about November 3, 2010, Mathew was recalled to the stand and lied under oath-recanting his prior testimony that he wrote out the photo lab receipt at 8:35pm on September 25, 2007 and claiming he did not write the receipt.

44. Due exclusively to Detective Mathew's willfully false testimony at a suppression hearing, after recanting his initial testimony, the prosecution was able to avoid suppression of the physical evidence unlawfully recovered from the plaintiffs' home and permitted to use this evidence at trial to acquire a conviction on gun and ammunition charges, as well as a perjury charge against Richard Campbell related to the location of a gun allegedly recovered in his room.

45. Prior to November 3, 2010 plaintiffs had no knowledge that the photographs of guns and ammunition allegedly recovered from their home were delivered to the NYPD photo lab prior to the execution of a search warrant on September 25, 2007, and similarly had no knowledge that the guns and ammunition allegedly recovered from their home was the result of a warrantless and unlawful search.

46. Plaintiffs knew they had been injured by defendants due to their incarceration on either high bail (Campbell) or remand (McLennon) while awaiting trial and the fact that they were being prosecuted for A level, B level, and C level felonies for murder manslaughter, assault in the first

degree, and weapons related offenses. However, plaintiffs did not know the cause of their injury was Detective Galasso and all other named defendants violation of their Fourth Amendment right against unlawful searches and seizures, 14th amendment liberty to be free from malicious and unjustified litigation, and 14th amendment due process right to a fair trial.

.47.     It was not until November 3, 2010 that defendants learned that the cause of their unlawful arrest and detention for gun and related charges was the unlawful search and tainted seizure of evidence from their home prior to the above named defendants actually obtaining a warrant on false pretenses. Plaintiffs, until that point in time, were blamelessly ignorant as to the cause of their injury (unlawful arrest, incarceration, and prosecution).

48.     On or about May 2, 2011 plaintiffs learned of the existence of an unredacted Intake Report, whereby Detective Deluca, acting in concert with the other above named defendants, lied to the Queens District Attorney Office about the eye witness account of the above mentioned confidential informant; whereby Detective Deluca claimed he had a confidential informant witness who observed plaintiffs shooting the complainant outside of their home.

49.     Detective Deluca conveyed this false information to the Queens District Attorney's Office even though he knew he was furthering, promoting, initiating and continuing a criminal prosecution for attempted murder,

murder, manslaughter, assault in the first degree, and criminal possession of a weapon based on an intentional falsehood.

50.    Plaintiffs were blamelessly ignorant of the fact that one of the causes of their unlawful arrest, incarceration pending trial, and prosecution was the fact that Detective Deluca had lied to the Queens District Attorney Intake Bureau about the confidential informant's true eye witness account.

51.    Plaintiffs learned that Detective Deluca's willful misrepresentations to the Queens District Attorneys Office caused them injury ( unlawful arrest, incarceration, and prosecution) when the unredacted Intake Report was discovered on or about May 2, 2011.

52.    On or about early December of 2011 it was disclosed during the testimony of Detective Mathew that he had handwritten notes evidencing which room each gun and ammunition was recovered from and the identity of the person who occupied that room, but that he lost his handwritten notes evidencing where he recovered each respective item of evidence within the McLennon home.

53.    This evidence was crucial to the defense since multiple individuals lived in the McLennon residence and the notes could have proven that the testimony of the defendants about recovering certain weapons and ammunition from the plaintiff's rooms was incredible.

54.    Plaintiffs had no knowledge Detective Mathew took notes about the location of certain evidence and to whom it belonged and had no knowledge that he purportedly lost this potentially exculpatory evidence

until Detective Mathew testified in their criminal trial on or about December 2011.

55.     Plaintiffs were blamelessly ignorant as to the fact that Detective Mathew caused their unlawful arrest and prosecution by losing potentially exculpatory evidence as to whose room each weapon was actually found-especially since the defendants had always maintained the weapons and ammunition recovered had been found in plaintiffs' rooms.

56.     Richard Campbell's clothing, which would evidence the presence or absence of gunpowder residue, was vouchered by Detective Steven Deluca of the NYPD, and was exculpatory evidence which proved that there was no gunshot residue on those clothes consistent with Richard Campbell ever having fired a gun.

57.     Despite multiple requests for the production of that clothing by the defense so that it could be inspected and analyzed for the presence or absence of gunshot residue and potential blood/ DNA evidence, Steven Deluca and the New York Police Department willfully refused to produce the clothing, claiming that it had been lost. This violated a clearly recognized constitutional right of plaintiff; to wit, due process of law and the right to a fair trial, and any objectively reasonable law enforcement official would have known the willful or grossly incompetent loss of such evidence was a violation of such a constitutional right.

58.     Plaintiffs learned on or about October 2013 that Detective Deluca, who

had recovered exculpatory physical evidence from Richard Campbell; to

wit, the clothing he was wearing on September 25, 2007, purportedly lost

this material evidence- which would have unequivocally proven Richard

Campbell never fired a gun via the absence of gunshot residue.

59.     Plaintiffs had no knowledge of the fact that Detective Deluca had lost this

clothing until on or about December 2011, when the prosecution failed to

comply with plaintiff's motion to compel the production of this

exculpatory evidence and it was disclosed during trial that Detective

Deluca had lost this crucial evidence after vouchering it.

60.     Plaintiffs were blamelessly ignorant that Detective Deluca's purported loss

of exculpatory evidence was the cause of their unlawful arrest and

continued prosecution on murder, manslaughter, assault in the first degree,

and weapons related charges.

61.     Detective Steven Deluca, who was listed as the official arresting officer in

the criminal case against plaintiffs, willfully and maliciously committed

perjury under oath during the criminal trial, in an attempt to convince the

trial jury that stab wounds photographed on Michael McLennon's body

were simply scratch marks and not stab wounds.

62.     Specifically, Deluca falsely claimed to the prosecutor, and subsequently

the trial jury, that he took photographs of McLennon's body on the date of

his arrest and that there was no evidence of any stab wound-only evidence of a minor "scratch" on McLennon's body.

63.  Deluca testified in front of a jury that Michael McLennon's prior criminal defense lawyer was present at the precinct when Deluca asked McLennon to undress so that he could photograph some scratches McLennon had on his body two days after the incident. Deluca inferred to the jury that the photographs he took proved McLennon's story about a stabbing in his residence were untrue, since all he had was some scratches.

64.  During the trial this testimony was exposed as a lie, and it was exposed that Detective Deluca never took any photographs of McLennon's body in the precinct at the time of his arrest, and that the photographs Deluca claimed to have taken at the time of arrest were actually photographs of the stab wound taken at Rikers Island several weeks after the stab wound had healed on McLennon's body.

65.  At the time Detective Deluca gave this malicious and willfully false testimony at trial in an attempt to bolster the Queens DA's Office's case and ensure a conviction, it was disclosed that Detective Deluca's present employer at the time of his testimony had become the Queens DA's Office itself.

66.    Plaintiffs learned of defendant Deluca's falsification of evidence at the time of trial, on or about December 2011, when defendant Deluca produced photos of Michael McLennon taken after his stab wounds had healed at the Rikers Island medical center, and falsely told the jury the photos were taken at the precinct at time of the incident and depicted a simple scratch-inconsistent with plaintiff's theory of self-defense.

67.    Defendants were blamelessly ignorant that the cause of their injury (unlawful arrest, prosecution, remand status pending trial and bail status) was Deluca's falsification of evidence to the prosecution and then the jury.

68.    The above defendants engaged in malicious conduct which any reasonable law enforcement official would know violated plaintiff's civil rights when they fabricated evidence; cross-contaminate DNA evidence; searched the premises and moved items around prior to getting a search warrant to do so, concealed the existence of blood in the house by refusing to voucher exculpatory forensic evidence; lost exculpatory evidence; fabricated evidence; and then gave perjurious testimony in the grand jury, suppression hearings, and at trial in order to bolster the prosecution's case, among other things- and they maliciously did this to ensure a conviction.

69.    The City of New York, Detective Galasso, Detective Russo, Detective Steven Deluca, Detective Philip Mathew, Detective Philip Hernandez, Sergeant Beatty, Lietenant Kaiser, Detective Alamonte, and Detective Bendig violated plaintiffs' fourth amendment right, incorporated by the fourteenth amendment, to be free of unreasonable searches and seizures

without probable cause, deprived plaintiff's of their 14th amendment due process right to a fair trial, and deprived plaintiff's of their fourteenth amendment liberty right.

70. All of the above named law enforcement defendants violated the plaintiffs' Fourth Amendment and Fourteenth Amendment right to be free of unreasonable searches and seizures by searching plaintiffs' home, removing evidence, cross contamination evidence, and photographing evidence before actually obtaining a search warrant to do so.

71. Detective Galasso and all of the above defendants violated plaintiff's 14th amendment liberty right and due process right when he maliciously and willfully 1. lied to the prosecutor about the presence of blood in the house, thereby enabling the prosecutor to argue for remand status of defendant McLennon and high bail for Campbell, on the pretense that there was no corroboration for plaintiff's self defense theory, 2. lied under oath to a grand jury and the trial jury, claiming that he found no blood inside of the McLennon home when he searched the residence, among other things-thereby refuting the defendants' version that the shooting was a self-defense shooting within their home to fend off a knife wielding invader. Defendant Galasso and the other above named defendants did this in order to ensure an indictment and a conviction.

72.   At the time Detective Galasso lied under oath to the Grand Jury and the trial jury, he knew his testimony was false, and that there was, indeed, blood in the house on the carpet, the wall and the furniture. After a motion to compel by the defense, scientific evidence disclosed the existence of blood on the carpet from the residence and the wall, contrary to Galasso's perjurious testimony.

73.   To cover up the existence of blood, all of the above defendants employed by the NYPD willfully refused to voucher evidence that would exculpate McLennon and Campbell; to wit the bloody carpet, the bloody wall, the and the bloody furniture. Additionally, they willfully refused to engage in forensic testing of evidence that would corroborate Richard Campbell's version of what transpired, including but not limited to conducting hair and fiber analysis of Winston Dixon's clothing to determine if he did in fact drag himself out of the house after being shot within, gunshot residue testing of Richard Campbell's clothes (which mysteriously became "lost" when plaintiffs sought to compel their production), among a myriad of other forensic tests that would have proved exculpatory.

74.   Richard Campbell, who never shot or harmed anyone, was charged with Attempted Murder, Murder, and Assault in the First Degree, among other charges, under the fiction that he was a second shooter who fired multiple shots at Winston Dixon.

75.   Richard Campbell at all times orally and in writing advised the police that
      he shot absolutely no one.

76.   Detective Bendig, Officer Vorraro, Detective Alamonte, Detective Deluca
      among the other defendans, lied at the inception of this case and before
      plaintiffs were even arraigned, claiming that defendant Richard Campbell
      made oral statements that his brother shot Winston Dixon outside the
      home without provocation and without reason.

77.   All named defendants knew that Richard Campbell never made such an
      incriminating oral statement and intentionally conveyed this false
      information to the Queens District Attorneys Office so that the statements
      could be used against plaintiffs in a criminal prosecution to obtain a
      conviction. These statements were used by the prosecution to successfully
      argue for high bail for Campbell, remand for McLennon, and to bolster the
      prosecution's case- so as to ensure a conviction.

78.   Based on these fabricated oral statements that defendants claimed were
      attributable to Richard Campbell, Michael McLennon was incarcerated on
      remand for four years awaiting trial and Richard Campbell was
      incarcerated on $150,000 bail awaiting trial.

79.   The above defendants continued to lie about Campbell's alleged
      statements, during the course of the entire criminal case, including but not
      limited to prior to the arraignment of plaintiffs, and in the grand jury,
      suppression hearing, and trial.

80.  Defendants knew they were lying each time they claimed that Richard
     Campbell had made a statement to them indicating that the shooting was
     unprovoked and that Richard's brother, Michael McLennon, shot Winston
     Dixon outside of the residence without justification.

81.  Defendants  willfully concocted false statements attributed to Richard
     Campbell to ensure a conviction and combat Campbell's written statement
     about his brother shooting in self defense within the home to avoid being
     stabbed by Winston Dixon.

82.  The above named defendants documented these fabricated statements,
     which they attributed to Richard Campbell in their police paperwork and
     then initiated and continued the prosecution of plaintiffs by forwarding
     this false information on the Queens DA.

83.  When a confidential informant told Detective Russo that Michael
     McLennon shot machete-wielding Winston Dixon inside the house in self-
     defense, the police swept the information under the rug and all of the
     above law enforcement officials aided and abetted each other in drafting
     police paperwork to reflect that this was an unprovoked shooting by both
     plaintiffs outside of their home, without just cause. Generating false
     statements, made attributable to Richard Campbell, was part of this
     process of fabricating evidence to make their investigation seem stronger
     than it actually was before passing the information on to the prosecution.

84.  All named defendants maliciously continued the prosecution of plaintiffs
     notwithstanding the discovery of information that exculpated them, and

the New York City Police Department, under the control of New York City, engaged in a practice and custom throughout this trial of concealing and losing exculpatory evidence, falsifying affidavits and confessions, and conducting warrantless searches in order to strengthen a weak case and ensure a conviction of two separate plaintiffs.

85. This violated plaintiff's constitutional right to be free from unlawful searches and seizures and to due process of law.

86. All of the above law enforcement officials cooperated with the prosecution by forwarding police paperwork that contained falsehoods, providing misinformation as to what statements Richard Campbell had made to enable the prosecution to serve statement notice at arraignments which bolstered the prosecution's case, and lying at suppression hearings, grand jury proceedings and trial in an attempt to secure a conviction of two plaintiffs, who were known to be innocent of all homicide, attempted homicide, manslaughter and assault charges.

87. As a result, defendant Michael McLennon was remanded to the custody of New York State Department of Corrections without bail for four years awaiting trial, due to the trumped up and contrived homicide charges he faced.

88. Similarly, Richard Campbell spent approximately one year in jail awaiting trial on extremely high bail because of the homicide related charges the NYPD had falsely and maliciously lodged against him, knowing that the

evidence at the scene corroborated his defense and exculpated him of wrongdoing.

89.    This practice and custom of illegal conduct by the NYPD, was continued during the course of four years while this case was pending by all named defendants.

90.    It was an unspoken practice, policy and custom of the 113 precinct of the NYPD to engage in the fabricating of evidence, concealing of exculpatory evidence, misrepresenting of evidence to the prosecution, conducting of warrantless searches, lying in affidavits, and lying in multiple court proceedings- in order to misrepresent the strength of their investigations and to ensure convictions.

91.    The management and supervisors at the NYPD condoned the chronic violations of plaintiff's civil rights by the law enforcement officials in its employ. Furthermore, when it was discovered that there was blood all over the carpet in the McLennon home in September 2008, the NYPD's crime scene unit was requested to come to the McLennon home and voucher the exculpatory carpeting.

92.    However, the Crime Scene Unit refused to return to the crime scene and voucher evidence that would potentially support plaintiff's version of self defense within the home, and the carpeting was therefore vouchered by the NYC Medical Examiner's Office at the plaintiffs' request.

93.    For all of the above reasons, all defendants have violated Michael McLennon and Richard Campbell's due process and liberty rights under

the 14th amendment to be free from malicious prosecution and unjustified litigation that is commenced or continued in the absence of probable cause.

94.　All defendant law enforcement officials have violated plaintiffs' rights under 42 United States Code Section 1983 because they are state actors acting under the color of state law who have violated plaintiff's civil right by disregarding and concealing exculpatory evidence, falsely arresting plaintiffs for homicide related charges without probable cause to substantiate those charges, purposely losing physical and documentary evidence, purposely committing perjury in suppression hearings and grand jury and trial, conducting warrantless and unlawful searches of plaintiffs' home, and falsifying affidavits in support of a search warrant and fake inculpatory statements to bolster their case. All of these actions deprive plaintiffs of due process of law, liberty and their right to be free of unlawful and unreasonable searches and seizures under the fourth amendment.

95.　Defendant's violated plaintiffs' civil rights which are clearly recognized constitutional rights in the Second Circuit.

96.　Any reasonable person in the above named defendants' shoes would know their conduct was unlawful and unreasonable and a violation of plaintiffs civil rights.

97.　All of the above named defendants initiated and continued a criminal proceeding against plaintiffs based on fabricated inculpatory statements

made attributable to Richard Campbell, unlawful and warrantless searches of the McLennon Campbell home yielding impermissibly seized evidence, fabricated and distorted information given to the DA's office, willful loss of exculpatory physical evidence and documentary evidence, willful refusal to collect blood stained carpet and and other blood evidence at the scene in order obstruct any attempt by plaintiffs to prove self-defense and escape criminal conviction, and false testimony in front of the Court.

98. All named defendants lacked probable cause to arrest defendants and to continue the prosecution against them, since 1. all evidence against plaintiffs was illegally seized in a warrantless search of their home, 2. defendants fabricated statements, that the police claimed Richard Campbell made, in order to implicate McLennon in an unprovoked shooting outside of the home, 3.defendants engaged in perjurious grand jury testimony, claiming there was no blood within the McLennon house (when DNA evidence proved the contrary); 4. defendants willfully lost or destroyed exculpatory evidence (Campbell's clothes and notes taken by defendant Mathews), 5. defendants lied to the prosecutor's office about the content of what the confidential informant saw and 6. Defendants lied about the absence of blood in the McLennon home, among other things mentioned above.

99. The indictments against McLennon and Campbell were procured by fraud, perjury, the suppression of evidence and other police conduct mentioned above, which was undertaken in bad faith and which completely

undermines the reliability of the indictment in this case, and defeats any presumption of probable cause.

100.   All named defendants maliciously initiated an attempted murder, murder, manslaughter, assault in the first degree, and weapons investigation, and maliciously continued the criminal proceedings against plaintiffs, knowing there was no probable cause to do so, by 1. fabricating evidence, 2. falsifying information in search warrant affidavits, 3. concealing evidence favorable to the plaintiffs, and 4. wilfully losing evidence that would exculpate plaintiffs, among other things mentioned above.

101.   Defendants conduct in arresting and continuing the prosecution of plaintiffs was motivated by malice, as they intiated, furthered and caused a prosecution against plaintiffs to continue as a result of improper and wrongful motives; to wit, in order to make the criminal case against plaintiffs seem stronger than it was and to ensure a conviction. This was intentional and, at the very least, in reckless disregard for the rights of the plaintiffs.

102.   Any officer of reasonable competence would agree that the defendants conduct in this case was extremely incompetent, unlawful, malicious, and prohibited by clearly established laws within the Second Circuit at that time.

103.   It was clearly established law at the time of plaintiff's arrest and prosecution that it was unlawful for an officer to misrepresent evidence to

prosecutors, fail to pass on material information to prosecutors, lose
material and exculpatory evidence, and make false statements.

104.    Plaintiff McLennon was acquitted of Murder in the Second Degree,
        Manslaughter, and Assault in the First Degree at trial by jury on December
        15, 2012 and convicted of gun and ammunition possession, and sentenced
        to 4.5 years in prison, which amounted to time served awaiting for trial.

105.    This was a favorable termination of that proceeding as it related to the top
        counts of Murder in the Second Degree, Manslaughter, and Assault in the
        First Degree, which could have carried a life sentence of imprisonment,
        and Mr. McLennon was released subsequent to being sentenced.

106.    Had the above defendants been successful in deceiving the trial jury with
        their perjurious testimony Michael McLennon could have served the rest
        of his life in prison.

107.    Richard Campbell was similarly acquitted of Assault in the First Degree
        and Criminal Possession of a knife (he had not been indicted on charged
        of Murder and Manslaughter and that was not before the trial jury). He
        was convicted of lesser crimes and given a sentence that also amounted to
        time already served in jail.

108.    The acquittal of Richard Campbell of Assault in the First Degree, which
        carries a sentence of up to 25 years in prison, was a favorable termination
        of this proceeding for Richard Campbell, who served no jail time after the
        day of sentencing.

109. The criminal proceedings against both plaintiffs terminated in their favor as both were almost immediately released from prison upon being sentenced, whereas they faced 25 years to life in prison if convicted of murder, manslaughter, or assault at trial.

110. Both plaintiff's were arrested on murder, attempted murder, assault in the first degree, weapons possession and possession of ammunition without probable cause to believe they had committed those crimes; they were placed in custody for an extensive period of time on those charges; faced the prospect of spending the rest of their life in prison, and were falsely arrested for those charges for the reasons stated above.

111. No reasonable law enforcement official would believe he had probable cause to arrest plaintiffs for homicide, attempted homicide, manslaughter, weapons offenses or assault, all of the blood and forensic evidence, witness statements, and the presence of shell casings within the interior of the home- proving the shooting occurred inside the home in self-defense. Moreover, no reasonable law enforcement official would believe that committing perjury is lawful and any reasonable person would know that such perjury violates plaintiff's civil rights.

112. Both plaintiffs were intentionally confined without their consent.

113. Michael McLennon is seeking punitive damages in the amount of $30 million dollars against the City of New York and all named defendants for willfully and maliciously violating his constitutional rights under 42 USCS § 1983; Michael McLennon is seeking $30 million emotional

damages for the pain, suffering, stress, trauma, and anguish he endured for approximately four and a half years sitting in a jail cell on remand waiting to be tried for murder, when all he did was defend his life and fight to prove his innocence in a situation where the NYPD was lying to secure a conviction, and the after affects of being so falsely accused; Michael McLennon is suing for compensatory damages in the amount of $200,000 for all the years of work he has lost as a result of this case, compensation for his legal fees, and other related costs associated with the above named defendants' misconduct.

114. Richard Campbell is seeking punitive damages in the amount of $30 million dollars against the City of New York and all named defendants for willfully and maliciously violating his constitutional rights under 42 USCS § 1983; Richard is seeking $30 million emotional damages for the pain, suffering, stress, trauma, and anguish he endured for years waiting to be tried for murder, when he never even harmed anyone and where the NYPD was lying, losing and distorting evidence to secure a conviction, and the after affects of being so falsely accused; Richard Campbell is suing for compensatory damages in the amount of $100,000 for all the time of work he has lost as a result of this case, compensation for his legal fees, and other related costs associated with the above named defendants' misconduct.

<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

115. Plaintiffs repeat and reallege the aforementioned allegations.

116.  Defendants' malicious conduct in concealing exculpatory information, lying under oath about the presence of blood within the home, fabricating inculpatory statements made by Richard Campbell, and refusing to examine evidence that would exonerate defendants constituted outrageous conduct not acceptable in a civilized society.

117.  Defendants outrageous conduct caused plaintiffs to suffer severe emotional distress, since they faced the prospect of spending the rest of their lives in prison based on trumped up charges and the perjurious testimony of defendants.

118.  Plaintiffs suffered injury as a result of defendant's outrageous behavior; to wit, mental anguish, severe emotional distress, and anxiety.

119.  Plaintiff Michael McLennon seeks compensatory damages in the amount of $200,000, punitive damages in the amount of $30 million, and emotional damages in the amount of $30 million.

120.  Plaintiff Richard Campbell seeks compensatory damages in the amount of $100,000, punitive damages in the amount of $30 million, and emotional damages in the amount of $30 million.

121.  Plaintiffs demand trial by jury.

Dated: October 9, 2013
       New York, New York

TAMARA M. HARRIS
The Law Office of Tamara M. Harris
111 Broadway, Ste 706
New York, New York 10006
(212) 334-1050

I, michael Mclennon have read the within Amended Complaint and verify that the contents therein are true to the best of my Knowledge

_____
MICHAEL MCLENNON

Sworn to before me this 9th day of
~~January~~ 2013
October

_____
NOTARY PUBLIC

AUDREY J THOMPSON
Notary Public - State of New York
NO. 01TH6062839
Qualified in Greene County
My Commission Expires 8/20/17