UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
MICHAEL MCCLENNON and RICHARD
CAMPBELL,

     *Plaintiffs*,

**MEMORANDUM & ORDER**

-against-

13-CV-128(KAM)(SMG)

NEW YORK CITY, POLICE OFFICER
VORRARO, DETECTIVE GALASSO,
DETECTIVE RUSSO, DETECTIVE STEVEN
DELUCA, DETECTIVE PHILIP MATHEW,
DETECTIVE DANIEL HERNANDEZ,
SERGEANT BEATTY, DETECTIVE BENDIG,
LIEUTENANT KAISER, DETECTIVE
ALAMONTE, and OFFICERS JOHN DOE 1-
5.

     *Defendants*.
--------------------------------X

**MATSUMOTO, United States District Judge:**

       Plaintiffs Michael McClennon ("McClennon") and Richard
Campbell ("Campbell," and together with McClennon, "plaintiffs")
initially brought this action on January 9, 2013 pursuant to 42
U.S.C. § 1983 ("section 1983") and New York law. Plaintiffs
asserted violations of their rights in connection with their
arrest and subsequent prosecution following the shooting death
of Winston Dixon at plaintiffs' home in Queens, New York on
September 25, 2007.

       As more fully set forth below, on March 31, 2015, the
court granted in part and denied in part certain defendants'
motions to dismiss for failure to state a claim upon which
relief can be granted. As a result, the only claims remaining

before the court are plaintiffs' claims for malicious prosecution. Plaintiffs have asserted these claims against the following defendants (collectively, "defendants"): Lieutenant Michelle Kaiser ("Lieutenant Kaiser"), Officer Daniel Hernandez ("Officer Hernandez"), Detective Steven DeLuca ("Detective DeLuca"), Sergeant Daniel Beatty ("Sergeant Beatty"), Detective Robert Russo ("Detective Russo"), Detective Peter Galasso ("Detective Galasso"), Detective Daniel Bendig ("Detective Bendig"), Officer Matthew Vorraro ("Officer Vorraro"), and Officer Philip Mathew ("Officer Mathew").[1]

Presently before the court is the remaining defendants' motion for summary judgment as to the remaining causes of action. In support of their motion, defendants have submitted a memorandum of law, (ECF No. 169-2), a statement of material facts pursuant to Local Rule 56.1, (ECF No. 169-1), a declaration by Queens County Assistant District Attorney Patrick O'Connor, (ECF No. 169-3), and a declaration by Elissa Fudim, counsel for defendants, ("Fudim Decl.," ECF No. 169-4), together with accompanying exhibits. (ECF Nos. 169-5 through 169-18.) Defendants have also submitted a reply memorandum, (ECF No.

---

[1] The parties' respective statements of material facts, and therefore this memorandum and order, refer to each defendant's rank of September 25, 2007. Defendants note that several defendants have since been promoted or retired, and their rank may have changed since the date of the incident. (Defendants' Reply to Plaintiffs' Local Civil Rule 56.1 Counter-Statement of Material Facts, ("RSMF," ECF No. 170-1), ¶ 23 n.4.)

170), a reply declaration from Ms. Fudim, (ECF No. 170-2), and exhibits to the reply declaration. (ECF Nos. 170-3 through 170-5.)

Defendants have also submitted a Joint Deposition Transcript Annex ("JDTA"), consisting of thirteen appendices, (ECF Nos. 170-6 through 170-18), and a reply to plaintiffs' Local Rule 56.1 counter-statement of material facts, ("RSMF," ECF No. 170-1), which incorporates defendants' Local Rule 56.1 statement, plaintiffs' counter-statement, and defendants' reply statement.

In addition to the aforementioned Local Rule 56.1 counter-statement of material facts, (ECF No. 172), plaintiffs have submitted a memorandum in opposition to summary judgment, (ECF No. 171) and 36 exhibits. (*See* ECF Nos. 172-175 (attaching exhibits).)[2]

For the reasons set forth below, the court grants defendants' motion in its entirety.

## BACKGROUND

## I. Factual Background

The following facts are taken from the Defendants' Reply to Plaintiffs' Local Rule 56.1 Counter-Statement of

---

[2] The court notes that a number of plaintiffs' exhibits are duplicative of exhibits to Ms. Fudim's declaration in support of defendants' motion for summary judgment, or of materials included in the JDTA. For ease of reference, this order cites to exhibits and transcripts using the designations in Ms. Fudim's declaration and the JDTA to the extent possible.

Material Facts, which, as noted above, incorporates defendants'
initial Local Rule 56.1 statement, plaintiffs' counter-
statement, and defendants' reply, and the supporting exhibits
cited by the parties.  The court summarizes only those facts
that are material to the adjudication of the instant motion.

Additionally, plaintiffs' Local Rule 56.1 counter-
statement frequently purports to controvert statements in
defendants' statement of material facts, but does so without
citing to specific evidence in the record, and sometimes without
citing to any evidence at all, or with a citation that does not
support plaintiffs' position.  Rather than note and discuss
every purported dispute, the court will summarize those material
facts that are not genuinely in dispute and note the existence
of certain factual disputes relevant to the instant motion.

Further, the court notes that both parties' Local Rule
56.1 submissions contain certain statements that do not find
support in the material(s) cited.  The court will not consider
these statements to be established, even where a party
purporting to controvert the statement has not complied with
Local Rule 56.1.  Instead, the court will rely on the statements
supported by admissible evidence.

## A.    The September 25, 2007 Incident

Plaintiffs are brothers.  (RSMF ¶ 1.)  As of September
2007, plaintiffs both resided at 191-20 110 Road in Queens, New

York (the "Residence"). (*Id.* ¶ 7.) Winston Dixon ("Winston")
and his son Rasheel Dixon ("Rasheel") had previously lived in
the basement of the Residence, (*id.* ¶ 3), but vacated the
basement at some point in late August or early September of
2007. (*Id.* ¶ 4.) After moving out, the Dixons returned to the
Residence on several occasions to retrieve belongings. (*Id.* ¶
5.) On September 23, 2007, Winston returned to the Residence
and kicked down a basement door of the Residence. (*Id.* ¶ 6.)

Winston and Rasheel again returned to the Residence
two days later, on September 25, 2007. (*Id.* ¶ 10.) As Winston
and Rasheel approached the Residence, Campbell exited the main
door and asked Winston why he had kicked in the door to the
basement. (*Id.* ¶ 11.) McClennon then exited the Residence, and
a verbal confrontation between McClennon and Rasheel ensued.
(*Id.* ¶¶ 11-12.) At this point, the confrontation became
physical. Plaintiffs contend that Rasheel approached McClennon
with a bottle and raised it, and it is undisputed that McClennon
either punched or pushed Rasheel. (*Id.* ¶ 14.) Winston then
drew a large knife and began chasing McClennon, who retreated
towards the Residence. (*Id.* ¶ 15.) Rasheel and Campbell
followed Winston and McClennon, (*id.* ¶¶ 16-17), and at some
point in the encounter, McClennon drew a semi-automatic pistol
and fired shots at Winston. (*Id.* ¶ 18.) Winston sustained six

gunshot wounds.  (*Id.* ¶ 19; Autopsy Report, Fudim Decl. Ex. H, ECF No. 169-12, at 4.)

Rasheel called 911, McClennon ran upstairs, and Campbell went to a different part of the Residence to retrieve his phone to call 911 (it is unclear, and immaterial, whether Campbell actually called 911).  (RSMF ¶¶ 20-21.)  McClennon then left the Residence in his car, and was already gone when Campbell returned to the front area of the Residence.  (*Id.* ¶¶ 21-22.)  Shortly thereafter, the first police units arrived at the Residence.  (*Id.* ¶ 23.)  Officer Vorraro was among the first on the scene, and upon arriving, he saw Rasheel on the sidewalk with a "severe laceration to his hand" and saw paramedics tending to Winston, who was laying on the front stoop of the house, outside the front door.  (*Id.* ¶¶ 23-25.)  Rasheel told Officer Vorraro that both McClennon and Campbell had shot Winston.  (*Id.* ¶ 26.)  Officer Vorraro assisted paramedics in moving Winston to an ambulance, and after Officer Vorraro assisted them, Campbell exited the Residence.  (*Id.* ¶¶ 28-29.)  In the presence of officers, Rasheel again accused Campbell of participating in Winston's shooting.  (*Id.* ¶ 30.)  Campbell was then handcuffed and placed in a patrol car.  (*Id.* ¶ 31.)

Officer Vorraro stood guard by the patrol car in which Campbell had been placed, (*id.* ¶ 32), and while Campbell was in the car, Campbell told Officer Vorraro that the Dixons had been

at the Residence earlier in the week. (*Id.* ¶ 33; *see also*,
*e.g.*, Vorraro Deposition Transcript ("Vorraro Tr."), JDTA Ex. 4,
at 102:19-103:7.) Campbell also denied that he had shot at
Winston, but stated that McClennon had shot Winston. (*Id.* ¶
34.) Plaintiffs contend that Campbell also told Officer Vorraro
that the shooting was an act of self-defense and took place
inside the Residence. (*Id.*) Winston was taken to the hospital,
(*id.* ¶ 35), and ultimately passed away eleven days later, on
October 6, 2007, as a result of his injuries. (*Id.* ¶ 69.)

### B. Accounts of Events

Rasheel told the police, and testified before all
three grand juries ultimately convened in connection with the
events of September 25, 2007, that both plaintiffs drew guns and
shot at Winston. (*Id.* ¶ 36; *see also id.* ¶¶ 181-88 (discussing
grand juries).) Rasheel also testified before all three grand
juries that Winston had a large knife, but claimed that Winston
only pulled out the knife after McClennon and Campbell drew
guns. (*Id.* ¶ 37.) Rasheel apparently offered inconsistent
accounts as to the precise location of the shooting, as he told
the grand juries that McClennon had fired shots from inside the
Residence, but Detective DeLuca testified at his deposition that
Rasheel told him that the shooting took place outside the
Residence, "in the front area leading to the walkway." (*Id.* ¶
38-39; DeLuca First Deposition Transcript ("DeLuca Tr."), JDTA

Ex. 3, at 91:9-92:5.)  Additionally, Rasheel claimed that his hand was injured while McClennon and Campbell were shooting. (RSMF ¶ 40.)

Campbell consistently denied having drawn a gun or having fired shots at Winston, and made this denial to Officer Vorraro, Detective Bendig, Detective DeLuca, and all three grand juries.  (*Id.* ¶ 42.)  Campbell further claimed that Winston had drawn a knife before any guns were involved and had then chased McClennon into the Residence, (*id.* ¶ 43), that Rasheel then followed McClennon and Winston, and that Campbell had then followed the others.  (*Id.* ¶ 44.)  Campbell heard shots before he entered the Residence and, upon entering, dove just inside the front door and found himself on top of Winston, who had already been shot.  (*Id.* ¶¶ 45-47.)  Campbell pushed himself away from Winston and saw McClennon with a gun, (*id.* ¶ 48), and asked McClennon not to shoot.  (*Id.* ¶ 50.)  Campbell told the third grand jury that McClennon acted in self-defense.  (*Id.* ¶ 51.)

McClennon, who surrendered himself to the police on September 27, 2007, admitted that he kept a nine-millimeter gun in his Residence and that he shot Winston, which he claimed to have done in self-defense.  (*Id.* ¶¶ 52-54.)  According to McClennon, Winston pulled out a large knife and chased him into the Residence, where Winston either stabbed him or struck him

with the knife.  (*Id.* ¶ 55.)  McClennon claimed that he reached under his living room sofa, where he kept a loaded nine-millimeter pistol, retrieved the pistol, and shot Winston in self-defense.  (*Id.* ¶ 56.)  McClennon told the first grand jury that he had fired two shots at Winston.  (*Id.*; First Grand Jury Transcript ("Grand Jury 1 Tr."), Fudim Decl. Ex. D, ECF No. 169-8, at 58:17-59:6, 81:3-5.)  McClennon then fled the scene in a panic and threw the gun away in an alley.  (RSMF ¶ 57.)

John Cook ("Cook"), who lived across the street from the Residence, told police that he saw an argument between McClennon and Campbell and two other men, (*id.* ¶ 58), and that he had heard, but not seen, gunshots fired and believed, based on his familiarity with guns, that the shots came from two different weapons.  (*Id.* ¶ 60.)

Additionally, a confidential informant (the "CI") witnessed the incident and spoke to Detective Russo and the prosecutor, and testified before all three grand juries and at trial.  (*Id.* ¶ 61.)  The CI claimed that he saw a man with dreadlocks (fitting McClennon's description) punch a tall man (fitting Rasheel's description) in the face, then saw a man with a short crew cut hair style (fitting Campbell's description) draw a gun.  (*Id.* ¶¶ 61-63.)  The CI further stated that a heavy man (fitting Winston's description) pulled out a very large knife from his waistband, and that McClennon and Campbell began

to retreat towards the Residence, and Winston followed them with the knife. (*Id.* ¶¶ 64-65.)

Certain of the CI's statements regarding what he saw on September 25, 2007 suggest that he believes that gunshots were fired inside the Residence. (*See* CI Deposition Transcript, JDTA Ex. 13, at 90:17-19 ("Q: When you hear the gun shots everybody is inside the house? A: Yes."); *see also* RSMF ¶ 66 (quoting CI statement at deposition that "then his brother with the dreads *runs in with them* and he's going in his waist and all I hear is gunshots and then the son *comes out* like 'oh, they shot my father.'" (emphasis added)).) However, other accounts are less clear as to where the CI believed the shooting to have taken place. (*See* Second Grand Jury Transcript ("Grand Jury 2 Tr."), Fudim Decl. Ex. E, ECF No. 169-9 at 115:11-117:24 (including statements from CI that he saw the "old man," *i.e.* Winston, pull[] out a knife and "the other low-hair guy," *i.e.* Campbell, "pull[] out a gun," and heard a series of gunshots when "they [we]re all towards the front of the house-way").) In any event, after witnessing the incident, the CI called 911. (RSMF ¶ 68.)

## C. The Investigation

### 1. Initial Investigation at the Residence

Kaiser, who was at the time a Squad Lieutenant, responded to the Residence upon hearing a radio call reporting

the shooting. (*Id.* ¶ 70.) When she arrived, Winston was in the process of being, or had already been, loaded into an ambulance. (*Id.* ¶ 71.) Detectives DeLuca and Galasso also arrived at the scene after the shooting, although by the time they arrived, at least three or four marked police cars and at least eight uniformed officers had arrived, and crime scene tape had already been put up. (*Id.* ¶¶ 72-73.) Detectives DeLuca and Galasso conferred with Officer Vorraro and Lieutenant Kaiser, (*id.* ¶¶ 74-75), but left the scene after approximately fifteen to twenty minutes and went to North Shore Hospital in Manhasset, New York, where Rasheel and Winston had been taken. (*Id.* ¶ 76.)

Detective Russo also arrived on the scene, together with non-party Detective Laspina ("Detective Laspina"), after crime scene tape had been put up. (*Id.* ¶ 77.) Detective Russo never entered the Residence, and instead, at Lieutenant Kaiser's direction, went door-to-door canvassing the neighborhood for witnesses. (*Id.* ¶ 78.) Detective Bendig also went to the Residence after the shooting. (*Id.* ¶ 79.) His initial visit to the scene was brief, (*id.* ¶ 80), but Campbell testified at his deposition that Detectives Bendig and DeLuca took him back to the Residence later in the day. (Campbell Deposition Transcript ("Campbell Tr."), JDTA Ex. 2, at 129:19-131:1.) Campbell claims that during this visit, he pointed out to Detectives Bendig and

DeLuca blood on the carpet and wall in the foyer, on the doorframe, and on a flower planter outside the Residence. (*Id.*)

Additionally, Officers Mathew and Hernandez and their supervisor, Sergeant Beatty, arrived at the scene as members of the New York Police Department Evidence Collection Team ("ECT"). (RSMF ¶ 87.) Generally speaking, ECT collects evidence pertaining to robbery, burglary, and property crimes, while a separate unit within the New York Police Department, the Crime Scene Unit ("CSU") collects evidence for homicides and other more serious crimes. (*Id.* ¶ 81.) Generally, CSU members receive more training than ECT members, and CSU documents crime scenes more comprehensively than ECT does. (*Id.* ¶¶ 82-83.) In this case, the decision as to whether to call CSU or ECT fell to Lieutenant Kaiser, who decided to call ECT based on her understanding that Winston was "critical but stable," and therefore unlikely to die. (*Id.* ¶¶ 84-86.)

Officer Hernandez testified at his deposition, and plaintiffs do not controvert, that he had been an ECT member for approximately three months, was "still learning in evidence collection," and his role on the scene was to assist Officer Mathew. (Hernandez Deposition Transcript, JDTA Ex. 8, at 36:15-37:1.) Officer Mathew took fourteen photos of the outside of the Residence, as well as photos of the evidence that was collected and vouchered outside the Residence. (RSMF ¶ 89.)

12

The evidence collected outside included a large knife found in a bush near the front door of the Residence, a knife sheath found near the knife, and two shell casings. (*Id.* ¶¶ 90-91.) Regarding the shell casings recovered outside the Residence, one was found on the walkway "to the immediate right of the steps leading up to the front stoop," and the other was found on a step up to the Residence. (*Id.* ¶ 91.)

Sergeant Beatty was present at the Residence during the afternoon, but never returned. (*Id.* ¶ 92.) Defendants submit that Sergeant Beatty was not involved in the case after leaving the crime scene in the afternoon, though plaintiffs dispute this because, at some unspecified point, Sergeant Beatty instructed Officer Mathew in ECT's procedures and based on Sergeant Beatty's instructions, Officer Mathew took "minimal" photographs inside the Residence. (*Id.* ¶ 93; *see also* Mathew Deposition Transcript ("Mathew Tr."), JDTA Ex. 7, at 225:24-228:7 (discussing Sergeant Beatty's instructions to Officer Mathew).)

### 2. Interviews with Rasheel and Campbell

Detectives DeLuca and Galasso spoke with Rasheel in the emergency room at North Shore Hospital. (RSMF ¶ 94.) Rasheel's left hand was injured, but he was alert and coherent, and gave the detectives his account of what had occurred at the Residence. (*Id.* ¶¶ 94-95.)

Detective Bendig interviewed Campbell, who by this time had been transported to the 113th Precinct. (*Id.* ¶ 96.) Non-party Detective Faranda was present, and plaintiffs contend that Detective DeLuca and Officer Vorraro were also present. (*Id.* ¶ 96.) Detective Bendig read Campbell his *Miranda* rights, but Campbell chose to speak to the detectives and provide a written statement. (*Id.* ¶ 97.) In addition to the written statement, Campbell made certain oral statements in his interview. (*Id.* ¶¶ 98-100.) Detective Bendig prepared a DD-5 report,[3] which defendants contend sets forth the details of Campbell's oral statements in the interview, but which plaintiffs contend was, at least in part, fabricated. (*Id.*) Specifically, defendants assert that

> [Detective] Bendig lied in his DD5 [sic] and entered details that were the opposite of what Campbell told him, fabricating a story about a shooting outside the home where [McClennon] gunned down Winston after he and Rasheel had already fallen on the steps; and about how [Campbell] admitted to drawing a knife.

(*Id.* ¶ 99.)

Detective DeLuca also met with Campbell at the 113th Precinct and vouchered Campbell's clothes, specifically a gray shirt and jeans. (*Id.* ¶ 127.) Citing only to Campbell's own

---

[3]   The parties do not expressly explain what a DD-5 report is, but based on the parties' papers and the DD-5 reports annexed as Exhibit I to the Fudim declaration, it appears that a DD-5 is a report of an interview conducted by police in connection with an investigation.

deposition testimony, plaintiffs contend that Detective DeLuca "never really" delivered this clothing to the 113th Precinct's property clerk, (*id.* ¶ 130 (citing Campbell Tr. at 211-17, 219)), but Detective DeLuca testified that after receiving the clothing, he vouchered it, sealed it, and delivered it to the property clerk at the 113th Precinct. (DeLuca Second Deposition Transcript, JDTA Ex. 12, at 18:11-23:5.) At some point, it became clear that the property clerk could not locate Campbell's clothing. (*See* RSMF ¶¶ 130-31 (referring to lost clothing).)

Additionally, according to Campbell, while he was at the 113th Precinct, either Detective DeLuca or Detective Bendig tested his hand for gunshot residue. More specifically, at his deposition, Campbell stated that, during a conversation at the 113th Precinct, Detective DeLuca told him that if Campbell claimed that he "ain't buss it,"[4] Detective DeLuca would test Campbell's hand for gun residue. (Campbell Tr. at 125:22-126:10; *see also* Campbell Tr. at 124:7-12 (establishing that officers had taken Campbell to the 113th Precinct by the time of this conversation).) Campbell further testified as follows:

> Q. Now, did they search you, or did they pat you down?
> A. Yeah, they search me. After I said he – he – he took the – the – put my hand on something, and took the – whatever you call – the CCC – gun residue on my hand. After that, I – I asked him. He said, no, he didn't see nothing on my hand.

---

[4]     The record reflects that "buss" and/or "boss" are Jamaican slang terms for "shoot." (Campbell Tr. at 126:20-21.)

```
Q. This is still DeLuca?
A. DeLuca and Bendig.
Q. But who did the test for the residue on your
hand?
A. I don't recall which – the name.
```

(*Id.* at 127:19-128:6)

```
Q. When they were questioning you, did you tell
them everything about the incident?
A. Yes. I told them everything about the incident
– before and after – when DeLuca and Bendig, I
told them the incident again, that the shooting
happened inside of the house, and what happened.
They also said that they would take the gun
residue off my hand.  If I didn't do it, they
would have let me go.  They took the – DeLuca
took the residue, and he never did let me go.
```

(*Id.* at 160:23-161:7.)

Later in his deposition, Campbell again stated that he

had been tested for gunshot residue and that Detective DeLuca

had performed the test, (*id.* at 214:5-215:11), and further

testified that, after Detective DeLuca performed the gunshot

residue test, he told Campbell "you're good," which Campbell

took to mean that there was no gunshot residue.  (*Id.* at 215:8-

17.)

For his part, Detective DeLuca has denied that he

tested Campbell for gunshot residue and/or told Campbell that he

passed the test, and specifically denied that he told Campbell

that, if Campbell did not admit that he "bossed it," Detective

DeLuca would test him for gunshot residue.  (DeLuca Tr., JDTA

Ex. 3, at 236:17-237:7.)  Detective DeLuca also testified

16

regarding the procedure for testing subjects for gunshot residue, and stated that a gunshot residue test would be requested through CSU, whose members would perform the test themselves by taking a swab, then send the materials to a laboratory for testing. (*Id.* at 238:10-239:13.) Detective DeLuca clarified that he had never personally performed a gunshot residue test, that in his experience, ECT does not perform gunshot residue tests, and that the 113th Precinct, where Detective DeLuca interviewed Campbell, does not keep gunshot residue test materials on hand. (*Id.* at 239:14-240:16.)

Lieutenant Kaiser also testified regarding the procedure for gunshot residue testing and stated her understanding that CSU, but not ECT, was generally responsible for conducting gunshot residue tests. (Kaiser Deposition Transcript ("Kaiser Tr."), JDTA Ex. 11, at 189:11-190:16.) Lieutenant Kaiser further stated that gunshot residue testing might not be dispositive as to whether or not a person fired a gun because, for example, a suspected shooter could have washed his or her hands before the test was administered, which would have an adverse impact on the test's reliability. (*Id.* at 190:17-191:4.)

### 3. Subsequent Investigation at the Residence

At some point in the late evening of September 25, 2007, Detectives Galasso and Laspina, and Lieutenant Kaiser

returned to the Residence to search it.[5]  (*Id.* ¶ 107; Galasso
Deposition Transcript ("Galasso Tr."), JDTA Ex. 5, at 130:10-18,
132:4-9.)  Shortly after their arrival, members of the ECT,
including Officers Hernandez and Mathew, and possibly an ECT
supervisor (but not Sergeant Beatty) arrived at the Residence to
take part in the search.  (RSMF ¶¶ 108-09.)  During the evening
search, Detective Galasso searched the Residence, while
Lieutenant Kaiser remained in the Residence's dining room,
though Lieutenant Kaiser passed through the foyer and the living
room to get to the dining room.  (*Id.* ¶¶ 110-11; Kaiser Tr. at
127:14-128:21.)  Detective DeLuca did not participate in the
evening search.  (RSMF ¶ 112.)

The ECT collected and vouchered 55 "items" of evidence
from the Residence, but because some of those items had multiple
sub-parts, ECT actually collected over 100 pieces of evidence.
(*Id.* ¶ 114.)  Among the items collected and vouchered inside the
Residence were two shell casings, which Officer Mathew collected
in the living room and just inside the dining room.  (*Id.* ¶
116.)  Officer Mathew did not take photographs of each item of

---

[5] `    Plaintiffs note that Campbell testified at his deposition that when he
returned to the Residence with Detectives Bendig and DeLuca on the afternoon
of September 25, 2007, he saw Officer Mathew and Detective Galasso searching
the Residence, and that Officer Mathew and/or Detective Galasso were taking
photographs, or at least had in their possession a Polaroid-style "instant
camera."  (Campbell Tr. at 191:22-194:4.)  Plaintiffs refer to this search
several times and contend that this search was illegal, but do not explain
why the search was illegal, and in any event, the legality of this search is
irrelevant to plaintiffs' remaining causes of action.

evidence collected, and instead took only three photographs inside the Residence, particularly of the firearms and ammunition recovered. (*Id.* ¶ 115.) During the search, Detective Galasso visually scanned each room in the Residence looking for ballistic evidence, including bullet impact marks, but found none, and Officer Mathew did not look for ballistic impact marks at all. (*Id.* ¶ 118-19.)[6]

At their depositions, Officer Mathew, Detective Galasso, and Lieutenant Kaiser all testified that they did not notice any blood on the carpet[7] of the Residence, though McClennon and Campbell stated at their own depositions that, in substance, each of them saw blood in the house and the officers who searched the house must have seen the blood as well. (*Id.* ¶ 121; Mathew Tr., JDTA Ex. 7, at 101:8-10, 103:13-17; Kaiser Tr. at 127:18-128:10; Galasso Tr. at 158:3-13; McClennon Deposition Transcript ("McClennon Tr."), JDTA Ex. 1, at 143:8-144:4; Campbell Tr. at 230:15-231:2.)[8]

---

[6]     The court notes that these paragraphs are two of many instances in which plaintiffs purport to dispute a material fact offered by defendants, but do so by merely stating "[f]alse," and do not cite to evidence or explain why defendants' cited evidence does not actually support the proposition.  A one word, conclusory denial does not suffice to raise a dispute to a statement in a Local Rule 56.1 statement. *See* Fed. R. Civ. P. 56(c); Local Rule 56.1(d).  Thus, paragraphs 118 and 119 of defendants' Local Rule 56.1 statement are deemed admitted pursuant to Local Rule 56.1(c).

[7]     The entire first floor of the Residence was carpeted, and in the living room, the carpet was red.  (RSMF ¶ 120.)

[8]     The court notes that defendants object to the court's consideration of these portions of McClennon and Campbell's deposition testimony because plaintiffs' counsel elicited the testimony with improper leading questions, and defendants' counsel preserved the objections at the depositions.

Officer Mathew, Detective Galasso, and Lieutenant Kaiser also testified at their depositions that they did not notice any spots of blood on the walls of the Residence, though once again, McClennon and Campbell testified, in substance, that based on their recollection of the scene at the Residence, any officers who searched it must have seen blood. (RSMF ¶ 122; Mathew Tr. at 109:8-11, 111:19-22; Kaiser Tr. at 127:18-128:10; Galasso Tr. at 158:3-13; McClennon Tr. at 143:8-144:4; Campbell Tr. at 230:15-231:2.) Additionally, Campbell testified that he pointed blood out to Detectives Bendig and DeLuca, who were not present for the evening search of the Residence. (Campbell Tr. at 129:19-131:1.)

Officer Mathew testified at his deposition that he used the same procedure and protocols at the Residence as he had used at other crime scenes. (Mathew Tr. at 197:11-14, 232:17-233:3.) However, Officer Mathew, who is now a member of the CSU, also testified that if he were responding the scene at the Residence today and as a member of the CSU, he would process the scene differently. (RSMF ¶ 126.)

### 4. *Interview and Photographs of McClennon*

As noted above, McClennon surrendered himself at the 113th Precinct on September 27, 2017. (RSMF ¶ 53; Neville Mitchell Trial Testimony ("Mitchell Tr."), Plaintiffs' Ex. U, ECF No. 174-5, at 2800:3-2801:15.) Detective DeLuca testified

at his deposition that, at the 113th Precinct, McClennon took off his shirt and Detective DeLuca saw that McClennon had scratches on his body.  (DeLuca Tr. at 252:25-254:13.) McClennon's then-attorney, Neville Mitchell ("Mitchell"), however, testified at McClennon's trial that he never consented to allow Detective DeLuca or any other detective to examine McClennon's body, nor did he observe McClennon remove his clothes and expose injuries to his torso.  (Mitchell Tr. at 2801:16-2802:24.)  Mitchell also testified that, during the time he was present at the 113th Precinct following McClennon's surrender, neither Detective DeLuca nor any other detective had McClennon remove his clothes to expose injuries to his torso. (*Id.* at 2801:21-24.)

At some point, photographs of McClennon's torso area were taken, whether at the 113th Precinct, subsequently at Rikers Island, or at both locations.  (RSMF ¶¶ 137-38.)  At trial, Detective DeLuca testified that he took a number of photographs of McClennon's body in the precinct shortly after McClennon's arrest and that the photographs accurately captured how his injuries appeared at that time.  (*Id.* ¶ 137.)  During voir dire to determine the admissibility of certain photographs, Detective DeLuca stated that he was completely certain that three of the photographs the prosecution sought to introduce were taken at the 113th Precinct on the day McClennon was

arrested, but he could not be similarly certain as to where the remaining photographs were taken.  (*Id.* ¶ 138.)

The state court initially excluded the additional photographs from evidence, but Detective DeLuca subsequently testified on cross-examination that he recognized the walls in the interview room in the photos and could therefore confirm they had been taken at the precinct.  (*Id.* ¶ 139-140.) Detective DeLuca further testified, on re-direct examination, that regardless of where the remaining photographs were taken, Detective DeLuca saw McClennon's wounds on the day McClennon surrendered himself, and the photographs reflected how the wounds appeared on that date.  (Trial Transcript ("Trial Tr."), Fudim Decl. Ex. J, ECF No. 169-14, at 1489:22-1490:3.)  The state court then admitted the photographs.  (*Id.*)

### 5. *Ballistics and Blood Evidence*

After Winston passed away on October 6, 2007, the Nassau County Office of the Medical Examiner conducted an autopsy on October 7, 2007, which found "six gunshot wounds present on the deceased's body."  (Autopsy Report, Fudim Decl. Ex. H, ECF No. 169-12, at 1, 5.)  Additionally, three bullets were recovered from Winston's body, and a ballistics report showed that the four shell casings recovered at the Residence and the three bullets from Winston's body came from the same nine-millimeter gun.  (RSMF ¶¶ 144-45.)

Additionally, after plaintiffs' indictments,[9] the New York City Office of the Chief Medical Examiner ("OCME") took and examined portions of the carpet from the foyer and living room of the Residence. (*Id.* ¶¶ 196-97.) OCME produced a report of its investigation (the "OCME Report"). (*Id.* ¶ 198; *see also* OCME Report, Fudim. Decl. Ex. N, ECF No. 169-18, at 1-2.)[10]

More specifically, the OCME Report states that on September 19, 2008, Norman Marin, a Criminalist III with OCME's Special Investigations Unit ("SIU") went to the Residence to document it and identify any bloodstain evidence. (*See* OCME Report, Fudim Decl. Ex. N, ECF No. 169-18, at 1.) With Mr. Marin were plaintiffs' criminal defense counsel (who is also plaintiffs' counsel in the instant action), an Assistant District Attorney from the Queens District Attorney's Office, another OCME SIU employee, and two defense experts, one of whom was Mr. Ralph Ristenbatt ("Ristenbatt"). (*Id.*) According to the OCME Report, at the time of the examination, the Residence "appeared to be in the process of renovation," and, "with the exception of the foyer and some areas of the living room, the

---

[9]     The indictments and prosecution are discussed more fully in the next sub-section of this order.
[10]     Because Exhibit N to the Fudim Declaration contains two documents, references to page numbers in citations to that exhibit are to the page numbers generated by ECF, and not the page numbers indicated on the documents themselves.

walls and floor of the [R]esidence appeared to be in various stages of demolition." (*Id.* at 2.)

Prior to OCME's examination of the scene, Ristenbatt "collected four (4) swabs of apparent bloodstains from a wall adjacent to the front entrance of the residence" and transferred these swabs into the custody of OCME SIU personnel in a sealed envelope. (*Id.* at 1.) During the examination, 40 photographs of the foyer, living room area, and carpet were taken, and a "hand drawn sketch" was prepared.[11] (*Id.* at 2) Additionally, "[t]wo sections of carpet, one from the foyer (carpet A) and the other from the living room (carpet B), were removed from the floor, packaged, and sealed." (*Id.*) Ristenbatt indicated that he observed "apparent blood on several areas of the carpet in the foyer which he did not collect." (*Id.* at 1.)

OCME analyzed carpet A and carpet B by treating them with luminol, which is a "presumptive test for blood that produces a blue chemiluminescence, or chemical based light emission" when it reacts with blood. (*Id.* at 2, 2 n.1.) OCME observed 20 areas where chemilumenescent reactions occurred on carpet A, which came from the foyer. (*Id.* at 2) These areas were marked, photographed, and examined with a stereomicroscope, and "[a]reas within the marked regions where red-brown material

---

[11]    None of these materials are presently before the court.

was observed adhering to the carpet fibers were additionally treated Kastle-Meyer (KM) reagent," which is "a presumptive test for blood that produces a pink color" when blood is present, "and further documented with photography." (*Id.* at 2, 2 n.2) Seven "stains" on carpet A were found to have "KM positive red-brown material," and these were subsequently submitted for DNA testing. (*Id.* at 2.)

The OCME Report indicates that carpet B, which came from the living room, was also treated with luminol, and chemiluminescent reactions occurred on seven areas. (*Id.*) These seven areas were examined with a stereoscope,[12] and "no red-brown material visibly consistent with blood was observed."[13] (*Id.*) Additionally, the swabs received from Ristenbatt were tested with KM reagent and three of the four "yielded positive KM results." (*Id.*) A cutting from each of the positive swabs was submitted for DNA testing. (*Id.*)

---

[12] The OCME Report refers to the instrument used to examine carpet A as a "stereomicroscope" and the instrument used to examine carpet B as a "stereoscope." (OCME Report at 2.) Based on the nature of the materials examined, it appears that, as used in the OCME Report, both terms refer to the same type of instrument, although the precise instrument used is not material to the disposition of the matters before the court.

[13] Plaintiffs' Local Rule 56.1 counter-statement contains a lengthy footnote that appears to intend to cast doubt on the significance of OCME's findings. The footnote does not include any citation to record evidence, though it appears that certain of its assertions are addressed in the OCME Supplement (as defined and discussed herein). Rather than parse which of the footnote's assertions find support in the record and which do not, the court will summarize the OCME Supplement.

OCME also produced a second report (the "OCME Supplement") dated December 6, 2010, after further testing had taken place.  (*See generally* OCME Supplement, Fudim Decl. Ex. N, ECF No. 169-18, at 3-6.)  The OCME Supplement states that OCME was "requested to examine carpet sections for the presence of bloodstains in order to determine if Winston Dixon was shot inside the . . . [R]esidence," (*id.* at 3), and notes various circumstances that "diminished" the "reconstructive value of any bloodstain evidence on the carpet."  (*Id.* at 4.)

Specifically, the OCME Supplement notes that "the carpet was not secured or treated as an item of evidentiary value between the date of the incident and the date upon which the carpet was collected."  (*Id.*)  This was a period of nearly one year – from September 25, 2007 to September 19, 2008.  Moreover, the OCME Supplement notes that the only "record of the manner in which the carpet was treated subsequent to the shooting incident" is that which "can be drawn from the statements of Det[ective] Galasso, Richard Campbell, and Michael Mc[Cl]ennon."  (*Id.*)  The OCME Supplement states that "according to testimony provided by [Detective Galasso] on October 4, 2007, blood was *not* observed on the carpet during the initial investigation," (*id.* (emphasis in original)), and observes that "[t]he color of the carpet certainly made it difficult to visualize possible blood."  (*Id.*)

The OCME Supplement also notes that the possibility that blood could have been transferred from one area of the carpet to another. More specifically, the difficulty of seeing bloodstains made it "quite possible" that blood had been transferred in an "inadvertent" manner, "thereby altering the original distribution of the blood on the carpet." (*Id.*) Additionally, the OCME Supplement notes that "even after blood ha[d] dried, individuals walking on the carpet," including individuals working on the renovations that OCME observed in September 2008, "could have disturbed dried blood, causing it to flake and transfer to another area of the carpet." (*Id.*)

The OCME Supplement further explains that "[c]arpeting in general is not an optimal substrate for the interpretation of bloodstain pattern evidence due to its texture and resilience." (*Id.*) As a result of these characteristics, "[w]hat may otherwise appear as a circular or oblong stain on a smooth unyielding surface will often appear amorphous on carpeting." (*Id.*) In practical terms, these characteristics precluded a determination as to "whether the blood on the carpet was deposited there as a result of a contact transfer," which is "produced when a blood covered object comes into physical contact with another object or surface," or as a result of "the impact of air borne [sic] droplets." (*Id.* at 4 and 4 n.1.)

In light of the foregoing circumstances, OCME could not "determine within a reasonable degree of scientific certainty that Winston Dixon was shot within the . . . [R]esidence." (*Id.* at 4.) More specifically, the OCME Supplement states that, although

> blood consistent with Winston Dixon's DNA profile was identified on a section of carpet A adjacent to the entrance door of the residence, it cannot be determined from the examination if this blood was deposited there as a result of gunshot related spatter or blood dripping/projecting from Winston Dixon's injuries subsequent to the shooting, or from direct physical contact between [Winston] Dixon and the carpet. Furthermore, Richard Campbell testified on October 4, 2007 that he "fell" in the [Residence] and had blood all over him. Although not directly stated in his testimony, Campbell suggests that it was Winston Dixon's blood that was on his clothing. Unfortunately there is no report indicating that Richard Campbell's clothing was examined for the presence of blood and therefore no data on which to evaluate the veracity of his statement. Campbell's alleged contact with the carpet could have deposited Winston Dixon's blood on it.

(*Id.* at 4-5.)

The OCME Supplement also addresses a letter that Ristenbatt wrote to the state court. (*Id.* at 5.) Although Ristenbatt's letter is not before the court, the OCME Supplement indicates that the letter "stated that 'it does not appear that [OCME] performed a competent, comprehensive forensic analysis of th[e] evidence'" and "suggested a 'paucity' of examination notes." (*Id.* (quoting Ristenbatt letter).) In response, the

OCME Supplement notes that Ristenbatt had an opportunity to "conduct a thorough and competent examination" himself, and that OCME generated "twenty one (21) pages of notes and diagrams . . . outlin[ing] the numerous visual inspections and examinations, presumptive tests, and stereoscopic examinations performed on the carpet over the course of several days." (*Id.*) These notes and diagrams are not in the record in the instant action.

Additionally, the OCME Supplement indicates that Ristenbatt took issue with OCME's use of luminol. According to the OCME Supplement, Ristenbatt "stated with regard to the examination of carpet B," which was the sample from the living room, "that 'it does not appear as if [OCME] examined the carpet visually prior to the application of [l]uminol.'" (*Id.* (quoting Ristenbatt letter).) In contrast to Ristenbatt's equivocal language, the visual examination of the carpet by OCME is documented in the OCME Supplement, which provides that "SIU notes dated January 27, 2009" state that "'[i]tem 2 (carpet B) was photographed and visually inspected' prior to the [l]uminol testing." (*Id.* (quoting SIU notes).)

The OCME Supplement also states that "Ristenbatt opined that '[l]uminol is best utilized as a method of last resort, after all avenues of detection have been employed.'" (*Id.* (quoting Ristenbatt letter).) The OCME Supplement does not take issue with this opinion, but states that

> [i]f the notes and documentation provided were
> properly considered, it should be evident that a
> visual examination coupled with presumptive
> testing, where deemed appropriate, was conducted.
> Only after such an examination was [l]uminol
> applied in a judicious and uniform manner to the
> carpet.

(*Id.*)

Mr. Marin, who signed the April 6, 2009 OCME Report, also signed the OCME Supplement. (*Id.* at 6.) Jeffrey Buszka also signed the OCME Supplement, and, like Mr. Marin, is listed as a "Criminalist III" with OCME's SIU. (*Id.* at 6.)

### 6. *Plaintiffs' Prosecution*

On September 26 and 27, criminal complaints were filed against Campbell and McClennon, respectively, and, although the parties dispute the precise nature of Detective DeLuca's involvement in producing the criminal complaints, there is no dispute that Detective DeLuca reviewed them for accuracy and signed the final version. (RSMF ¶ 147.) The criminal complaints charged both McClennon and Campbell with, among other things, two counts of attempted murder in the second degree, two counts of assault in the first degree, and criminal possession of a weapon in the second degree. (*Id.* ¶ 148-49.) Both criminal complaints stated that they were based on information conveyed to Detective DeLuca by Rasheel, hospital personnel, and Detective Galasso. (Complaints, Fudim Decl. Ex. B, ECF No. 169-6, at 2,4.) The information that Detective Galasso conveyed to

Detective DeLuca for purposes of the complaints related solely to weapons recovered at the Residence. (*Id.*)

A grand jury was convened on October 4 and 5, 2007. (RSMF ¶ 181.) The grand jury heard testimony from, in relevant part, McClennon, Campbell, Rasheel, Cook, and the CI, and returned indictments against both plaintiffs. (*Id.* ¶¶ 181-83.) A second grand jury was convened on January 8 and 9, 2008, following Winston's passing, heard testimony from Campbell, Rasheel, Cook, and the CI, and also returned indictments.[14] (*Id.* ¶¶ 184-87.)

A third grand jury was convened on May 29 and June 2, 5, and 6, 2008, possibly because the second grand jury's indictment was dismissed due to the instructions given the grand jury. (*Id.* ¶¶ 187-88.) The third grand jury heard testimony from Campbell, Rasheel, and the CI, and indicted Campbell and McClennon. (*Id.* ¶¶ 189-91.) More specifically, after hearing testimony, the third grand jury indicted McClennon on charges of murder in the second degree, manslaughter in the first degree, assault in the first degree, criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.01-

---

[14]    Plaintiffs contend that the second grand jury's indictments were dismissed because "ADA O'Connor obtained the indictment[s] without giving the grand jury any instruction on the law of self-defense," but do not support this assertion with any citation to evidence in the record. (RSMF ¶ 187.) In any event, plaintiffs do not explain the relevance to the instant action of the basis for the dismissal of the second grand jury's indictments.

2(B), criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.03-3, assault in the second degree in violation of New York Penal Law § 120.05-2, assault in the second degree in violation of New York Penal Law § 120.05-4, tampering with physical evidence, criminal possession of a weapon in the fourth degree, and unlawful possession of pistol ammunition. (*Id.* ¶ 192.)

Additionally, the third grand jury indicted Campbell on charges of assault in the first degree, criminal possession of a weapon in the third degree, criminal possession of a weapon in the fourth degree, unlawful possession of pistol ammunition, unlawful possession of a knife, and perjury in the first degree. (*Id.* ¶ 193.)

On December 14, 2011, McClennon was convicted of one count each of criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.03, criminal possession of a weapon in the fourth degree in violation of New York Penal Law § 265.01, tampering with physical evidence, and unlawful possession of ammunition. (*Id.* ¶ 200.) On December 14, 2011, Campbell was convicted of one count each of criminal possession of a weapon in the third degree and perjury in the first degree. (*Id.* ¶ 202.)

## II.  Procedural History

Plaintiffs commenced the instant action by filing a complaint (the "Initial Complaint," ECF No. 1) on January 9, 2013 against all current defendants, as well as against the City of New York (the "City") and "Detective Alamonte."  (*See generally* Initial Complaint.)  Certain of the defendants named in the Initial Complaint (the "Moving Defendants") sought leave to move to dismiss the Initial Complaint, (*see* Letter Motion Seeking Pre-Motion Conference, ECF No. 6), and on July 10, 2013, the court held a telephonic pre-motion conference regarding the Moving Defendants' proposed motion to dismiss.

At the pre-motion conference and in relevant part, the court granted plaintiffs leave to file an amended complaint and set a briefing schedule for the Moving Defendants' proposed motion to dismiss.  (*See* Minute Entry for July 10, 2013 Pre-Motion Conference.)  After receiving two extensions, plaintiffs filed their amended complaint ("Am. Compl." or the "amended complaint," ECF No. 17) on October 10, 2013, one day after their extended deadline to do so.  The court also granted several extensions with respect to the Moving Defendants' motion to dismiss the amended complaint and plaintiffs' opposition thereto, and that motion was fully briefed and submitted as of March 17, 2014.

On March 31, 2015, the court entered an order granting in part and denying in part the Moving Defendants' motion to dismiss the amended complaint. ("MTD Order," ECF No. 41) Specifically, the court denied the motion to dismiss with respect to McClennon's malicious prosecution claim based on his prosecution for murder in the second degree, manslaughter in the first degree, assault in the first degree and second degree, and criminal possession of a weapon in the second degree under New York Penal Law § 265.01(1)(B). (MTD Order at 34.) The court also denied the Moving Defendants' motion to dismiss with respect to Campbell's malicious prosecution claim based on his prosecution for assault in the first degree. (*Id.*) The court granted the remainder of the Moving Defendants' motion to dismiss and denied plaintiffs leave to amend, (*id.*), and therefore, the aforementioned claims are the only ones that remain before the court.

At the time the court entered its order on the Moving Defendants' motion to dismiss, not all defendants named in the amended complaint had been served. By January 26, 2016, however, plaintiffs had made service on all defendants except Detective Alamonte, who was dismissed as a defendant on that date. (*See* Minute Entry for January 26, 2016 Pre-Motion Conference; January 26, 2016 Docket Order Dismissing Detective Alamonte.)

Also on January 26, 2016, the court held a pre-motion
conference regarding certain of the remaining defendants'
proposed motion to dismiss for improper service.  (*See* Minute
Entry for January 26, 2016 Pre-Motion Conference.)  The court
set a briefing schedule for that motion in a docket order dated
February 3, 2016.  This second motion to dismiss was fully
briefed and submitted as of May 6, 2016, and denied by
memorandum and order dated February 14, 2017.  (ECF No. 142.)

Separately, on December 14, 2016, the court held a
pre-motion conference regarding defendants' proposed motion for
summary judgment, *i.e.*, the instant motion.  (*See* Minute Entry
for December 14, 2016 Pre-Motion Conference.)  The parties
agreed to a briefing schedule at that conference, (*id.*), and
after several extensions, the instant motion was fully briefed
and submitted as of August 30, 2017.

## LEGAL STANDARD

### I.    Rule 56

Federal Rule of Civil Procedure ("Rule") 56 provides
that "[t]he court shall grant summary judgment if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed
R. Civ. P. 56(a).

"[T]he mere existence of *some* alleged factual dispute
between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Id.* at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The nonmoving party must go beyond the pleadings, and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (internal quotation marks and citations omitted); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e). Further, Local Rule 56.1 provides that each statement of material fact on which a party relies in supporting or opposing a motion for summary judgment, "including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, . . . as required by [Rule 56(c)]." Local Rule 56.1(d); *see also* Fed. R. Civ. P. 56(e)(2) (authorizing the court to consider a fact undisputed where a party fails to properly address that fact as required by Rule 56(c)); *Pensionsversicherungsanstalt v. Greenblatt*, 556 F. App'x 23, 25 (2d Cir. 2014), as amended (Mar. 5, 2014) (noting requirements of Local Rule 56.1(d)).

Additionally, a party opposing summary judgment may not rely on "ultimate or conclusory facts and conclusions of law." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (citation omitted). "[C]onclusory statements are insufficient to raise a triable issue of material fact." *Id.* Instead, because it is "not

sufficient merely to assert a conclusion without supplying supporting facts or argument," a party opposing summary judgment must set forth "concrete particulars." *Id.* (internal quotation marks and citations omitted).

Moreover, when a defendant "moves for summary judgment on an issue that the plaintiff must prove at trial[,] [the defendant] need only point to an absence of proof on plaintiff's part" and "need not prove a negative." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). In such a situation, a plaintiff must "designate specific facts showing that there is a genuine issue for trial" to defeat summary judgment. *Id.* (quoting *Celotex*, 477 U.S. at 324).

## II. Malicious Prosecution

### A. Elements of the Cause of Action

"[I]n recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, [section 1983] adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (citation omitted). Accordingly, where New York is the forum state, a plaintiff asserting a section 1983 malicious prosecution claim must establish "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for

commencing the proceeding; and (4) actual malice as a motivation
for defendant's actions' — as well as a violation of the
plaintiff's rights under the Fourth Amendment." *Ying Li v. City
of New York*, 246 F. Supp. 3d 578, 604-05 (E.D.N.Y. 2017)
(quoting *Manganiello v. City of New York*, 612 F.3d 149, 160–61
(2d Cir. 2010)); *see also Boyd v. City of New York*, 336 F.3d 72,
76 (2d Cir. 2003) ("To succeed on a claim for malicious
prosecution, the plaintiff must show that a prosecution was
initiated against him, that it was brought with malice but
without probable cause to believe that it could succeed and that
the prosecution terminated in favor of the accused plaintiff."
(citations omitted)).

Because lack of probable cause is an element of the
cause of action, "the existence of probable cause is a complete
defense to a claim of malicious prosecution in New York."
*Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)
(citing *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y.
1983)).  Probable cause to prosecute exists where there are
"such facts and circumstances as would lead a reasonably prudent
person to believe the plaintiff guilty."  *Boyd*, 336 F.3d at 76
(citing *Colon*, 455 N.E.2d at 1250).

**B.    Presumption of Probable Cause for Indicted Plaintiffs**

"[U]nder New York law, indictment by a grand jury
creates a presumption of probable cause that may *only* be

rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino*, 331 F.3d at 72 (quoting *Colon*, 455 N.E.2d at 1251) (emphasis in original). Further, in New York, unlike in other states, a plaintiff may not rebut the presumption by "any evidence tending to show the absence of probable cause." *Colon*, 455 N.E.2d at 1251. This means that the finder of fact "may not weigh the evidence upon which the police acted or which was before the Grand Jury after the indictment has issued." *Id.*

Instead, New York law requires a showing that the *procurement of the indictment* was tainted. *See id.; see also Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) ("The grand jury's . . . indictment presumptively established . . . probable cause. [Plaintiff] was required to rebut that presumption by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*." (emphasis added)). Accordingly, "[t]he burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" *Rothstein*, 373 F.3d at 284 (quoting *Colon*, 455 N.E.2d at 1250); *see also Savino*, 331 F.3d at 73 ("[I]t is the plaintiff who

bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." (citing *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994))).

Therefore, where a plaintiff has been indicted on the charges that form the basis of a malicious prosecution claim, "[i]n order to survive a motion for summary judgment . . . [the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73.

Importantly, a plaintiff cannot meet this burden by "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)). Nor is it enough to show that a defendant had arguably exculpatory information and failed to convey it to prosecutors, absent a showing of bad faith. *See id.* at 73-75 (noting that even assuming officers were aware of a specific, arguably exculpatory observation made by a sergeant, the officers logically could have assumed that the sergeant would convey this information to the prosecutor, and consequently the officers' failure to convey the information themselves would have been "entirely reasonable").

### C. Personal Involvement

"To establish a section 1983 claim, 'a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity.'" *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004)), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016); *accord Grullon v. City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013) (collecting cases).

With respect to malicious prosecution claims in particular, "[t]o initiate or continue a criminal proceeding, 'a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Ying Li*, 246 F. Supp. 3d at 605 (quoting *Manganiello*, 612 F.3d at 163). "An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint." *Id.* (citing *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) and *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)). A defendant police officer can also initiate a prosecution where he creates "material, false information and forward[s] that information to a prosecutor, or

by withholding material information from a prosecutor."
*Costello*, 20 F. Supp. 3d at 415 (citations omitted).

**DISCUSSION**

The court reiterates that the only causes of action that remain pending are those that relate to the charges on which plaintiffs were indicted by the third grand jury and which were terminated favorably with respect to each plaintiff. Specifically, Campbell's only remaining cause of action is for malicious prosecution based on his favorable termination on the charge of assault in the first degree. (MTD Order at 34; *see also* Am. Compl. ¶ 108.) McClennon's remaining cause of action is for malicious prosecution based on his favorable termination on the charges of murder in the second degree, manslaughter in the first degree, assault in the first degree and second degree, and criminal possession of a weapon in the second degree under Penal Law § 265.03(1)(B). (MTD Order at 34; *see also* Am. Compl. ¶ 105.)

Plaintiffs' amended complaint did not sufficiently state a claim for malicious prosecution based on any other criminal charges, and "[i]t is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) (citing *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000) and *Bush v. Fordham Univ.*,

452 F. Supp. 2d 394, 406 (S.D.N.Y. 2006)); *accord Zdziebloski v. Town of E. Greenbush*, No. 15-CV-298(LEK)(CFH), 2017 WL 1968672, at *9 (N.D.N.Y. May 11, 2017) (collecting cases). Plaintiffs therefore may only oppose summary judgment based on the specific causes of action that were sufficiently pleaded in their amended complaint and not dismissed by the court, and may not oppose summary judgment based on any other criminal charge.[15]

Turning to the instant motion, there is no dispute that plaintiffs were indicted on the criminal charges that now form the basis for their malicious prosecution claims, (RSMF ¶¶ 192-93; MTD Order at 7, 34), and these indictments give rise to a presumption of probable cause as a matter of law. *Savino*, 331 F.3d at 72. To overcome this presumption, plaintiffs must, at the summary judgment stage, come forward with "evidence sufficient for a reasonable jury to find that [their] indictment[s] w[ere] procured as a result of police conduct undertaken in bad faith." *Id.* at 73.[16]

---

[15] Plaintiffs may not, for instance, base their opposition to summary judgment on the attempted murder charge against Campbell set forth in the criminal complaint that Detective DeLuca signed. (RSMF ¶¶ 147, 149.) Nor may plaintiffs they oppose summary judgment based on any charges presented to the first or second grand juries, or based on charges that were presented to the third grand jury and on which that grand jury declined to indict. (*See id.* ¶ 193 (containing assertion by plaintiffs that Campbell was not indicted on certain charges presented to the third grand jury).)

[16] Certain authority suggests that a plaintiff can rebut the presumption of probable cause created by an indictment by establishing that "the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures." *See Harris v. State*, 756 N.Y.S.2d 302, 303 (N.Y. App. Div. 2003) (citations omitted); *see also Hernandez v. State*, 644 N.Y.S.2d 380, 382 (N.Y. App. Div. 1996) (citations omitted). Regardless of whether a plaintiff may generally

In determining whether plaintiffs have come forward with sufficient evidence to rebut the presumption of probable cause, and in adjudicating the instant motion more generally, the court "may in its discretion opt to 'conduct an assiduous review of the record.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)). The court, however, "'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements." *Id.* (quoting *Monahan*, 214 F.3d at 292)); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Here, the court declines to independently comb through the over two thousand pages of exhibits that plaintiffs have submitted. Instead, in determining whether genuine issues exist for trial, the court will limit its review to that evidence which plaintiffs thought significant enough to cite in their Local Rule 56.1 counter-statement and their memorandum of law in opposition to summary judgment.

As set forth below, the court concludes that plaintiffs have not come forward with evidence that would enable

rebut the presumption of probable cause by establishing an egregious deviation from proper police procedures, plaintiffs cannot do so here because they submit no evidence, beyond conclusory assertions, regarding (i) what they contend are proper police investigative procedures or (ii) whether defendants adhered to the procedures.

a reasonable jury to conclude that plaintiffs' indictments by
the third grand jury were procured in bad faith.  Accordingly,
plaintiffs have failed to rebut the presumption of probable
cause created by their indictments, and defendants are entitled
to summary judgment.

## I.    Evidence Regarding Grand Jury Proceedings

As discussed above, to rebut the presumption of
probable cause created by their indictments, plaintiffs must
come forward with "evidence that the indictment[s] w[ere]
procured by 'fraud, perjury, the suppression of evidence or
other police conduct undertaken in bad faith.'"  *Savino*, 331
F.3d at 72 (quoting *Colon*, 455 N.E.2d at 1251).  This means that
plaintiffs must "establish what occurred in the grand jury, and
to further establish that those circumstances warrant a finding
of misconduct sufficient to erode the 'premise that the Grand
Jury acts judicially.'"  *Rothstein*, 373 F.3d at 284 (quoting
*Colon*, 455 N.E.2d at 1250).

Plaintiffs present very little information regarding
"what occurred" in the third grand jury.  Their Local Rule 56.1
statement does not contain a single citation to transcripts from
the third grand jury.  Further, to the extent plaintiffs' Local
Rule 56.1 statement expressly refers to proceedings before the
third grand jury, plaintiffs do not contend the indictments were
procured by bad faith.  (*See*, *e.g.*, RSMF ¶ 36 (admitting

defendants' assertions regarding the substance of Rasheel's testimony to the third grand jury and not asserting or citing to evidence of impropriety); RSMF ¶ 170 (asserting, without any supporting citation, that Officer Mathew testified "three times" before one or more of the grand juries).)  The little information plaintiffs do present fails to meet plaintiff's burden to "submit[] evidence sufficient for a reasonable jury to find that [their] indictment[s] w[ere] procured as a result of police conduct," including fraud, perjury, and the suppression of evidence, "undertaken in bad faith."  *Savino*, 331 F.3d at 73 (citations omitted).

### A.    Evidence Presented to Third Grand Jury

Plaintiffs' only assertion that is supported by a citation to evidence, that a defendant falsified or fabricated evidence presented to any grand jury, relates to the wrong grand jury.  More specifically, plaintiffs assert in their Local Rule 56.1 counter-statement that Detective Galasso "lied to the grand jury and told them there was no blood within the home and he concealed the fact he and Mathew were photographing the blood in the home and the shell casings on the rug during an afternoon illegal search that Richard Campbell witnessed."  (RSMF ¶ 175 (citing Plaintiffs' Ex. W, ECF No. 174-7).)  Plaintiffs' memorandum of law opposing summary judgment contains a

substantially similar assertion, but does not cite to any record evidence in support.  (Opp. at 35 n.47.)

In support of their assertion that a defendant lied to a grand jury, however, plaintiffs cite to testimony from the *first* grand jury, not the third grand jury which returned the indictment that led to plaintiffs' prosecution and trial.  (See Plaintiffs' Ex. W (indicating that document relates to indictment number 2562-07 and proceedings held on October 4, 2007).)  Further, plaintiffs do not explain how Detective Galasso's statements to the first grand jury could be relevant to the existence of bad faith in the procurement of indictments by the third grand jury.  Nor do plaintiffs cite to any of Detective Galasso's testimony before the third grand jury, or even assert that Detective Galasso testified before the third grand jury.[17]

In addition, plaintiffs' submissions refer to Cook's testimony before the first and second grand juries, but do not explain the relevance of this testimony to the indictments returned by the third grand jury.  (Opp. at 29 n.38; Opp. at 30 n.41.)

---

[17]    Defendants cite to deposition testimony by Detective Galasso that he testified "at the grand jury," but the testimony does not make clear what the substance of Detective Galasso's grand jury testimony was, or to which grand jury Detective Galasso referred.  (RSMF ¶ 174; Galasso Tr., JDTA Ex. 5, at 164:9-16.)

Plaintiffs also assert in their briefing that the CI had "hoped to be paid when he testified in front of the grand jury." (Opp. at 26 n.33 (citing Plaintiffs' Ex. G).) The parties do not dispute that the CI testified before the third grand jury. (RSMF ¶ 190.) Plaintiffs' assertion, however, is not supported by an acceptable citation to record evidence, because they cite to the entire video of the CI's deposition without pointing the court to specific testimony. Moreover, even if the CI testified that he expected to be paid, plaintiffs do not explain why the CI's expectation, without more, suffices to establish bad faith in the procurement of plaintiffs' indictments.

Thus, plaintiffs have not presented any evidence that fabricated or falsified evidence was put before the third grand jury.

**B.   Evidence Not Presented to Third Grand Jury**

Even in the absence of a showing of affirmative fabrication or falsification, a plaintiff may rebut the presumption of probable cause created by an indictment by showing that evidence was suppressed. *Savino*, 331 F.3d 72 (quoting *Colon*, 455 N.E.2d at 1251).

Here, plaintiffs repeatedly assert, without sufficient evidentiary support, that defendants saw blood inside the Residence and concealed or withheld this information from

49

prosecutors.  (*See*, *e.g.*, RSMF ¶¶ 80, 102, 121-22, 125, 151, 158.)  Plaintiffs, however, have not come forward with sufficient evidence from which a reasonable jury could conclude that any defendant or third party actually saw blood inside the Residence prior to the presentation of plaintiffs' cases to the third grand jury.

Plaintiffs' only evidence in support of their contention that defendants saw blood inside the Residence is plaintiffs' own deposition testimony.  (*See*, *e.g.*, *id.* (citing, in each instance, deposition testimony by one or both plaintiffs in support of plaintiffs' assertions that defendants saw blood).)

The deposition testimony cited by plaintiffs offers little information as to the basis for plaintiffs' belief that defendants saw blood inside the Residence.  The most robust explanation comes from Campbell's deposition testimony that he pointed out blood in "the foyer or the divider" to Detectives Bendig and DeLuca, and that "there was a blood-trail leading around the . . . doorframe because the doorframe was white." (*Id.* ¶ 80; Campbell Tr., JDTA Ex. 2, at 129:19-131:1.) Otherwise, the portions of deposition testimony to which plaintiffs cite consist of assertions by plaintiffs that, in sum and substance, there was so much blood in the Residence that

defendants must have seen the blood. (*See, e.g.* McClennon Tr., JDTA Ex. 1, at 146:10-19; Campbell Tr. at 230:15-231:2.)

Even setting aside that plaintiffs' counsel cites portions of her own compound and leading questions during plaintiffs' depositions, rather than defendants' deposition testimony, plaintiffs' evidence is insufficient to create an issue of fact regarding the defendants' observations at the crime scene. For example, plaintiffs cite the portion of Campbell's deposition transcript containing the following exchange no fewer than four times in their Local Rule 56.1 counter-statement, (*see* RSMF ¶¶ 158, 160, 164, 195), each time in support of an assertion that defendants must have seen blood in the Residence:

> Q. So, based on the fact that these defendants, DeLuca, Bendig, Galasso, Mathew, even Kaiser, the supervisor – isn't it a fact that all these defendants knew that there was blood in the house, a knife with a white handle recovered from a bush, they had your written statement as to what had happened, and out of all of these facts, do you think it was reasonable for those officers to arrest you and your brother on murder and manslaughter and assault charges?
> [DEFENDANTS' COUNSEL]: Objection.
> A. No, it was not reasonable at all.

(Campbell Tr. at 207:22-208:7.)

Not only is the plaintiffs' counsel's question leading and compound, its focus seeks Campbell's opinion regarding the

reasonableness of Campbell's arrest, a claim that has been dismissed.

As another example, in support of their contention that Officer Mathew, Detective Galasso, and Lieutenant Kaiser saw blood, (RSMF ¶ 121), plaintiffs cite to a portion of the McClennon deposition transcript in which plaintiffs' counsel asked McClennon whether he "believe[d] that a 400-pound man with four bullet holes in him was going to crawl out of a house and his son, with his hand severed by a knife, were [sic] going to run out of that house and not leave a blood trail that the police can see." (McClennon Tr. at 143:17-22.) McClennon answered, "I seen the blood." (*Id.*)

The foregoing deposition testimony of the plaintiffs merely conveys plaintiffs' account of the events of September 25, 2007, including plaintiffs' perception of the scene inside the Residence following the shooting, and plaintiffs' opinion as to how others could or should have perceived that same scene.

Plaintiffs' accounts differ from the accounts defendants have consistently given, and "where a plaintiff offers merely his version of events to rebut the presumption [of probable cause], this is nothing more than mere conjecture and surmise that the plaintiff's indictment was procured as a result of conduct undertaken by the defendants in bad faith, and is insufficient." *Soto v. City of New York*, 132 F. Supp. 3d 424,

456 (E.D.N.Y. 2015) (internal quotation marks and citations omitted); *accord Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) ("Where a plaintiff's only evidence to rebut the presumption of the indictment is his version of events, courts have found such allegations insufficient to rebut the presumption of probable cause." (internal quotation marks and citations omitted)); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (collecting cases).

Instead, where there are competing accounts of events, a plaintiff must offer some other evidence of impropriety, which courts have characterized as a "plus factor," to corroborate his testimony. *Brandon*, 705 F. Supp. 2d at 273-74 (citations omitted; *accord DaCosta v. Tranchina*, 281 F. Supp. 3d 291, 303 (E.D.N.Y. 2017) (citations omitted), *appeal docketed sub nom. DaCosta v. City of New York*, No. 18-95 (2d Cir. Jan. 12, 2018); *Peterson*, 935 F. Supp. 2d at 643 (citations omitted). Courts have found "plus factors" present where, for example, a plaintiff has come forward with documentary evidence or testimony from third parties that tends to support the plaintiff's account. *See*, *e.g.*, *Boyd*, 336 F.3d at 77-78 (holding that police booking sheet corroborating plaintiff's account combined with testimony gave rise to disputed issue of material fact in rebutting presumption of probable cause); *Brandon*, 705 F. Supp. 2d at 273-74 (finding that non-party

police officer's recollection of events tended to support plaintiff's version and constituted "plus factor").

Here, the record is devoid of evidence of any "plus factor" that supports plaintiffs' arguments regarding falsified or fabricated evidence.  Further, defendants have submitted admissible and undisputed evidence that corroborates defendants' consistent statements that they did not observe blood in the Residence.  Specifically, the OCME Report and OCME Supplement state, respectively, that OCME did not find any blood in the sample of carpeting from the living room, and that "[t]he color of the carpet certainly made it difficult to visualize possible blood."  (OCME Report and OCME Supplement, Fudim Decl. Ex. N, ECF No. 169-18, at 2, 4.)  Plaintiffs' counter-statement of material facts includes a lengthy footnote that takes issue with these findings, but plaintiffs do not cite to any record evidence in support of their contentions, and in any event, the OCME Supplement is not refuted by the unsupported arguments plaintiff raises.  (See RSMF ¶ 197 n.8; OCME Supplement, Fudim Decl. Ex. N at 5 (rebutting Ristenbatt criticisms).)

In sum, without personal knowledge of what defendants actually saw, plaintiffs have testified that defendants must have seen blood inside the Residence, but plaintiffs have not raised a factual dispute as to defendants' consistent testimony that they did not see blood.  Plaintiffs have not raised any

issue of fact, much less a "simple conflict of stories or mistaken memories," *Boyd*, 336 F.3d at 77, which would not, in and of itself, give rise to a triable issue of material fact as to whether plaintiffs can rebut the presumption of probable cause created by their indictments. Plaintiffs have offered no evidence or "plus factor" evidence that supports their contentions, and the only admissible evidence relevant to the lack of visible blood inside the Residence is unrefuted.

Plaintiffs therefore cannot rebut the presumption of probable cause based solely on their testimony that defendants saw and concealed blood evidence. *See*, *e.g.*, *Peterson*, 935 F. Supp. 2d at 643 ("Here, [plaintiff] has not presented any such 'competing testimony plus,' and therefore is unable to rebut the presumption of probable cause created by the grand jury indictment." (quoting *Brandon*, 705 F. Supp. 2d at 273)).

Accordingly, defendants are entitled to summary judgment on plaintiffs' malicious prosecution claims, because plaintiffs have not submitted sufficient evidence of fabrication, falsification, or suppression of evidence, or of any other bad faith conduct, in connection with the procurement of plaintiffs' indictments by the third grand jury.[18]

---

[18]    Even if plaintiffs had come forward with admissible evidence that officers saw blood inside the Residence, that evidence alone would not suffice to establish bad faith in the procurement of plaintiffs' indictments. Plaintiffs appear to contend that the presence of blood would establish that the shooting took place inside the Residence and thereby corroborate

## II.  Other Evidence

In addition to their unsupported contentions regarding blood evidence, plaintiffs make various assertions of bad faith conduct in officers' treatment of, and conduct with respect to, physical evidence, photographs, and eyewitness accounts. Even though defendants are entitled to summary judgment on plaintiffs' malicious prosecution claims based on the lack of evidence regarding proceedings before the third grand jury, the court addresses these contentions out of an abundance of caution.

Regarding their remaining assertions of bad faith conduct, plaintiffs again fail to present evidence connecting these aspects of the police response to the events of September 25, 2007 to the procurement of plaintiffs' indictments by the third grand jury.  Plaintiffs therefore cannot rebut the presumption of probable cause based on their contentions regarding physical evidence, photographs, and eyewitness accounts.

---

plaintiffs' accounts of events and/or establish that McClennon shot Winston in self-defense.  (*See*, *e.g.*, Opp. at 6.)  Both contentions are flawed.  The mere presence of blood inside the Residence would not conclusively establish that the shooting took place inside, particularly in light of uncontroverted evidence indicating that blood and shell casings were found outside the Residence.  (*See* Campbell Tr., JDTA Ex. 2, at 130:15-19 (stating that blood was present outside the door to the Residence and on a flower planter outside the Residence); RSMF ¶ 91 (stating that police recovered two shell casings outside the Residence).)  Further, whether a person applies deadly force inside or outside one's dwelling is relevant to a self-defense justification, but is not dispositive.  *See* N.Y. Penal Law § 35.15.

Further, even if plaintiffs had presented with evidence connecting purported actions by defendants to the procurement of plaintiffs' indictments by the third grand jury, as set forth below, the evidence in the record does not suffice to establish bad faith on the part of any defendant.

## A.    Physical and Photographic Evidence

### 1.    Gunshot Residue and Clothing

Plaintiffs contend that defendants engaged in bad faith conduct by testing Campbell's hands for gunshot residue and then concealing the results of that test, and by "willfully caus[ing]" the clothes Campbell was wearing during the incident to "vanish" so that they could not be tested for gunshot residue either.  (*E.g.*, RSMF ¶ 129.)

#### i.    Gunshot Residue Test

As an initial matter, the amended complaint alleges that defendants "willfully refus[ed] to take gunshot residue tests of Richard Campbell, to avoid having confirmation that their arrest of him as a second shooter was baseless."  (Am. Compl. ¶ 22.)  "[T]he allegations in [a] . . . [c]omplaint are judicial admissions by which [plaintiffs are] bound throughout the course of the proceeding." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks and citations omitted).  Plaintiffs therefore may not now contend,

in opposition to defendants' summary judgment motion, that Campbell's hands were in fact tested and the results unlawfully concealed because plaintiffs are bound to their prior judicial admission that Campbell's hands were *not* tested. *Id.*

Even setting aside the foregoing judicial admission, plaintiffs have not come forward with sufficient evidence that Campbell's hands were actually tested, or that defendants willfully lost Campbell's clothes. The only evidence that Campbell's hands were actually tested – as distinct from evidence that Campbell was told that his hand would be tested – is testimony from Campbell himself. Specifically, at Campbell's deposition, Campbell responded "[y]es" and "[y]es he did" when plaintiffs' counsel asked him if Detective DeLuca had tested his hand. (Campbell Tr., JDTA Ex. 2, at 214:5-215:7.) The only additional details that Campbell provides are that, after accusing Campbell of firing a gun, Detective DeLuca said, "oh, I'm going to test your hand. If I f[i]nd anything on your hand – or if nothing is on your hand, I would set you free." (*Id.* at 215:2-5.) Additionally, at some point thereafter, Campbell asked Detective DeLuca "what happened," and Detective DeLuca said, "you're good," which Campbell took to mean that Detective DeLuca had not found gunshot residue. (*Id.* at 215:8-17.)

Campbell's account of events alone is insufficient to create a genuine issue for trial. There is no evidence that the

residue test was ever conducted.  Instead, as noted above, a plaintiff's version of events, without corroboration, is mere conjecture and surmise and cannot suffice to establish that a plaintiff's indictment was procured as a result of bad faith conduct.  *Soto*, 132 F. Supp. 3d at 456 (citations omitted); *accord Peterson*, 935 F. Supp. 2d 628 at 642-43 (citations omitted); *Brandon*, 705 F. Supp. 2d at 273-74 (citing, *inter alia*, *Boyd*, 336 F.3d at 74, 77).

Further, the only other record evidence regarding gunshot residue testing comes from defendants, who deny having performed gunshot residue testing.  (*See* RSMF ¶¶ 129-130.) Defendants have directed the court to Lieutenant Kaiser's testimony that CSU can, but ECT generally would not, perform gunshot residue testing.  (RSMF ¶ 130; Kaiser Tr., JDTA Ex. 11, at 189:11-190:16.)  In this same testimony, Lieutenant Kaiser was asked whether officers "would have to call someone from [CSU] to come and" perform gunshot residue testing, and responded "[y]es[,] I don't believe evidence collection is able to do it."  (Kaiser Tr. at 190:12-16.)

Defendants also direct the court to Detective DeLuca's deposition testimony regarding gunshot residue testing.  (RSMF ¶ 129.)  In that testimony, Detective DeLuca, like Lieutenant Kaiser, states that in order to procure a gunshot residue test, an officer would have to "request it through [CSU]," which

"would come down . . . and do it and then the results would go to the lab and you'd get the results a little later."  (DeLuca Tr., JDTA Ex. 3, at 238:10-19; *see also* DeLuca Tr. at 239:3-240:12 (explaining gunshot residue testing procedures and denying having requested a test of Campbell's hand).)  Both Detective DeLuca and Lieutenant Kaiser testified that they did not conduct or procure a gunshot residue test.  (DeLuca Tr. at 237:4-7, 240:8-241:6; Kaiser Tr. at 192:11-13.)

Campbell testified that Detective DeLuca himself took the gunshot residue test, but did not offer any details regarding how the test was conducted, and Campbell did not mention waiting for test results to come back from a laboratory. (*See* RSMF ¶ 129 (citing Campbell Tr. at 211-17, 219); *see also* Campbell Tr. at 125:22-128:13 (discussing Detective DeLuca's interrogation of Campbell at the 113th Precinct, including alleged gunshot residue test).)  Defendants' unrebutted testimony therefore establishes that the general procedures for conducting a gunshot residue test were not commenced, and Campbell's conclusory statement that a gunshot residue test was conducted does not describe an actual gunshot residue test.

Campbell's testimony is not sufficient to create a genuine dispute whether a gunshot residue test was actually performed and its results suppressed.  At best, Campbell claims he was *told* that he would be tested for gunshot residue testing,

and does not establish that he was *actually* tested for gunshot residue.

Additionally, it is not clear that a negative gunshot residue test would have prevented Campbell's indictment for two reasons. First, the record includes unrebutted testimony that a negative gunshot residue test does not conclusively establish that a person did not fire a gun. (RSMF ¶ 128 (citing, in relevant part, Kaiser Tr. at 190:17-192:10).) Second, Campbell's only remaining claim arises from his prosecution for assault. The relevant indictment includes language indicating that Campbell was indicted as an aider and abettor. (*See* Indictment, Fudim Decl. Ex. C, ECF No. 169-7.) Campbell therefore could have been indicted and convicted even in the presence of conclusive proof that he had not fired a gun. *See*, *e.g.*, *People v. Sutter*, 556 N.Y.S.2d 959, 959-60 (N.Y. App. Div. 1990) (affirming assault conviction where defendant had not directly assaulted victim, but had acted in concert with assailant in connection with the assault); *see also Blount v. Moccia*, No. 16-CV-4505(GHW), 2017 WL 5634680, at *10 (S.D.N.Y. Nov. 21, 2017) (noting that, where indictment charged robbery and related crimes committed with "each aiding the others actually present," police's apprehension of one suspect did not "conclusively establish" malicious prosecution plaintiff's

innocence or negate the possibility that he had committed the crimes).

Further, although it is possible that prosecutors sought Campbell's indictment on a theory that Campbell did fire a gun, plaintiffs have not directed the court to any evidence that would establish as much, and it is plaintiffs' burden to "establish what occurred in the grand jury." *Rothstein*, 373 F.3d at 284. The court therefore declines to exercise its discretion to scour the record for facts that plaintiffs have failed to point out.

### ii. Campbell's Clothing

Plaintiffs assert that Detective DeLuca "willfully caused" the clothing Campbell was wearing during the events of September 25, 2007 "to vanish for 9 years." (RSMF ¶ 129.) Plaintiffs' evidence in support of this argument does not suffice to enable a reasonable jury to conclude that Detective DeLuca, or any other officer, willfully caused Campbell's clothing to "vanish."

Plaintiffs' evidentiary support for their assertions regarding Campbell's clothing is, in sum and substance, that Campbell gave his clothes to Detective DeLuca, and that the clothing was subsequently lost. For instance, in support of their assertion that "DeLuca never really delivered the clothing to the property clerk," plaintiffs cite eight pages from

Campbell's deposition transcript in which he essentially says that the clothes were lost. (RSMF ¶ 130; Campbell Tr. 211-17, 219.) Later, plaintiffs cite to these same pages in support of their assertion that Detective DeLuca, among other things, "purposely lost Campbell's clothing." (RSMF ¶ 151 (citing Campbell Tr. 210-19).)

Plaintiffs also assert that Detective DeLuca "never filled in an entry for [Campbell's clothing] in the 113[th Precinct] property clerk index." (Opp. at 14.) Confusingly, plaintiffs state, in the next sentence, "[t]he first entry regarding this property is found on May 25, 2008- which indicates the original voucher for this property was voided." (*Id.*) It therefore appears that there was, in fact, an entry for Campbell's clothing in the property clerk index. Plaintiffs also submit two lengthy footnotes regarding the voucher numbers for Campbell's clothes in which plaintiffs argue that there were irregularities in the vouchers' numbers suggesting that all vouchers were actually issued in 2008, not in 2007, when Detective DeLuca took possession of Campbell's clothes. (*See id.* at 14 n.13, 14 n.15.)

Plaintiffs do not explain why these recordkeeping issues suggest bad faith conduct and not an honest, if unfortunate, mistake. It therefore appears that, with respect to Campbell's lost clothes, plaintiffs have, at best, come

forward with evidence that may be "consistent with" bad faith conduct, but "just as much in line with a wide swath" of nonactionable conduct. *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 554 (2007). This would not suffice to defeat a motion to dismiss for failure to state a claim upon which relief can be granted, much less a motion for summary judgment. *Id.* Plaintiffs therefore submit insufficient evidence that the loss of Campbell's clothes was a result of bad faith and instead leave that critical connection to "mere 'conjecture' and 'surmise,'" which are insufficient to rebut the presumption of probable cause. *Savino*, 331 F.3d at 73.

Further, plaintiffs have not directed the court to evidence that actually supports their contentions regarding recordkeeping with respect to Campbell's clothes. For instance, plaintiffs submit several pages of the 113th Precinct's Property Index, (*see* Plaintiffs' Exhibit M, ECF No. 173-12), but point to nothing in the record that explains the significance, or establishes the completeness, of these records.

Thus, construing all of plaintiffs' contentions regarding police recordkeeping in the light most favorable to plaintiffs, plaintiffs proffer insufficient evidence for a reasonable jury to find bad faith conduct on the part of Detective DeLuca or any other officer, defendant or not, in the handling of Campbell's clothing.

### 2. *Photographs of McClennon*

Plaintiffs also contend that Detective DeLuca "lied to the prosecution and claimed he [had] t[aken]" certain photographs of McClennon's injuries that were introduced at trial, when in reality, he "never photographed" McClennon's injuries, and the photographs were "taken three weeks after [the injuries] were sustained, at Rikers Island." (Opp. at 16-17.) Plaintiffs further assert that Detective DeLuca "lied to the prosecution by claiming these photos . . . were taken with the consent of McClennon's criminal defense attorney, Neville Mitchell, in the precinct, and in the presence of Mr. Mitchell on September 27, 2007." (Opp. at 17.)

Notably, plaintiffs do not dispute that the relevant photographs were actually of McClennon. Additionally, Detective DeLuca testified at plaintiffs' trial that the wounds appeared in the photographs as they did on the day McClennon surrendered himself. (Trial Tr., Fudim Decl. Ex. J, ECF No. 169-14, at 1489:22-1490:3.)

Plaintiffs' contentions regarding Detective DeLuca's purported lies about the photographs of McClennon cannot establish bad faith in the procurement of plaintiffs' indictments. As an initial matter, plaintiffs refer solely to Detective DeLuca's trial testimony, not to any testimony or information that was put before the third grand jury. (*See* Opp.

at 17 and 17 n.18 (citing DeLuca trial testimony).)  Plaintiffs
therefore have not established that Detective DeLuca's
statements regarding the photos are relevant to the procurement
of plaintiff's indictments.  Further, even assuming that
Detective DeLuca's testimony at trial was relevant to the
procurement of plaintiffs' indictments plaintiffs do not have
sufficient evidence to support a finding of bad faith on
Detective DeLuca's part.

The significance of plaintiffs' contentions about
criminal defense counsel Mitchell's lack of consent to the
photographs is not at all clear.  Whether or not Mr. Mitchell
consented to the photographs is wholly irrelevant to the conduct
with which plaintiffs were criminally charged, and plaintiffs
submit no authority for the proposition that Mr. Mitchell's
consent was necessary to take the photographs.

Further, plaintiffs have not submitted evidence
sufficient for a jury to conclude that the photographs did not
accurately depict McClennon's appearance on the date he
surrendered himself.  Plaintiffs cite only to a portion of
McClennon's transcript in which he states that the wounds had
healed for three weeks by the time the photograph was taken.
(*See* Opp. at 17; McClennon Tr., JDTA Ex. 1, at 151:14-20.)
Construing McClennon's testimony in the light most favorable to
plaintiffs, it still falls short of establishing the falsity of

Detective DeLuca's statement that the photographs depicted McClennon's wounds as they did on the date McClennon surrendered himself.  Instead, it would only establish that the wounds were three weeks old, but this would leave any conclusion regarding the change in the appearance of the wounds over those three weeks to conjecture and surmise.

Accordingly, plaintiffs cannot rebut the presumption of probable cause based on their contention that Detective DeLuca lied about photographs of McClennon.

### B.    Eyewitness Accounts

Plaintiffs also take issue with officers' treatment of the eyewitness accounts of Rasheel, Campbell, Cook, and the CI. Specifically, plaintiffs contend that officers should not have credited Rasheel's eyewitness account, and that officers fabricated statements by Campbell, Cook, and the CI. Plaintiffs' contentions are without merit.

#### 1.    *Rasheel's Account*

Plaintiffs assert that "no objectively reasonable law enforcement officer, with half a brain, would have credited the story of Rasheel Dixon."  (Opp. at 30 n.41; *see also* Opp. at 37 n.51 ("[N]o objectively reasonable police officer would have credited Rasheel's story of an unprovoked shooting outside the home.").)  Plaintiffs do not connect their contentions to the procurement of plaintiffs' indictments.  Further, to the extent

plaintiffs assert that the police acted in bad faith in crediting Rasheel's account of the events of September 25, 2007, plaintiffs do not offer sufficient evidence in support.

Plaintiffs contend that the officers should not have credited Rasheel's story because of the presence of a knife and knife sheath at the Residence, blood inside the Residence, and the CI's statement that the shooting occurred inside the Residence after Winston chased McClennon with a knife. (Opp. at 37 n.51.) Plaintiffs further assert that Rasheel was in a gang and gave conflicting accounts of the events of September 25, 2007 to his mother and sister. (*Id.*)

This argument implicitly rests on the premise that the police should have credited fully all evidence favorable to plaintiffs, resolved all doubts in their favor, and not credited any evidence that was more consistent with Rasheel's account than with plaintiffs' accounts. To illustrate, plaintiffs contend that defendants should have fully credited the CI's statement that the shooting happened inside after Winston chased McClennon with a knife. (*Id.*) The CI also testified, however, that McClennon punched Rasheel in the face and that Campbell pulled a gun outside the house. (Grand Jury 2 Tr., Fudim Decl. Ex. E, ECF No. 169-9, at 115:16-23.) Plaintiffs certainly do not contend that the police should have fully credited these statements by the CI. (*See*, *e.g.*, RSMF ¶ 14 (purporting to

controvert defendants' assertion that McClennon punched Rasheel in the face).)  Nor do plaintiffs contend that the police should have fully credited Cook's statement – which he repeated under oath – that he heard shots fired from two different guns, (Grand Jury 1 Tr., Fudim Decl. Ex. D, ECF No. 169-8, at 28:25-29:18), and that it appeared to him that Campbell pulled a gun.  (*Id.* at 29:19-30:15.)

Here, certain evidence considered by law enforcement was consistent with Rasheel's account, and certain evidence was not.  The failure of law enforcement to credit fully all evidence favorable to a suspect in a criminal investigation, to resolve all doubts in favor of a suspect, and to ignore evidence tending to inculpate a suspect simply is not bad faith conduct.

Further, the contention that defendants should not have relied on Rasheel's account because of his apparent statement immediately after the shooting that the wound on his hand was a gunshot wound, not a knife wound, (RSMF ¶ 40), is baseless.  Rasheel made this statement shortly after witnessing McClennon shoot Winston, Rasheel's father, several times, at close range.  Rasheel sustained his injury during that same flurry of activity.  The court cannot conclude that, under those circumstances, the only reasonable, good-faith course of action would have been to refuse to credit Rasheel's account of events,

in its entirety, because his appraisal of the source of his injury was incorrect.

Finally, the record makes abundantly clear that officers did not mindlessly credit Rasheel's account of events. An intake report to which plaintiffs cite, (RSMF ¶ 37), notes that "[Rasheel] claims he did not see any knives," (*see* Intake Report, Fudim Decl. Ex. K, ECF No. 169-15, at 1),[19] but further states that "two knives were recovered – one from the location, one from defendant's person." (*Id.*) The intake report also incorporates statements from another witness and from Campbell to the effect that Rasheel and Winston had a knife. (*See id.*) Moreover, Rasheel testified at all three grand juries that Winston did have a knife (though he claimed that Winston only pulled the knife after he saw McClennon and Campbell with guns). (*See* RSMF ¶ 37 (citing Rasheel's grand jury testimony).)

On this record, no reasonable jury could conclude that defendants' treatment of Rasheel's account of the events of September 25, 2007 constitutes bad faith.

### 2. *Campbell's Account*

Plaintiffs assert that various defendants fabricated statements and attributed them to Campbell. (*E.g.*, RSMF ¶ 99, 171, 178, 195.) Plaintiffs do not explain the connection

---

[19]    Because Exhibit K to the Fudim Declaration is not consecutively paginated, references to page numbers in citations to that exhibit are to the page numbers generated by the ECF system.

between any of these purportedly fabricated statements and their indictments by the third grand jury. Further, Campbell's deposition testimony is the only evidentiary basis for plaintiffs' contentions regarding the fabrication of statements. (*See id.*) Once again, plaintiffs cannot rely solely on their version of events to rebut the presumption of probable cause. *Soto*, 132 F. Supp. 3d at 456 (citations omitted); *Peterson*, 935 F. Supp. 2d at 643 (citations omitted); *Brandon*, 705 F. Supp. 2d at 273-274 (citing, *inter alia*, *Boyd*, 336 F.3d at 74, 77). Further, plaintiffs' competing testimony, at least in some instances, was the result of plaintiffs' counsel's improper leading questions of her client.[20]

In any event, plaintiffs have not come forward with sufficient evidence that any statements were falsely attributed to Campbell. Plaintiffs state, in several different ways, that

---

[20]    As an example, plaintiffs cite portions of Campbell's deposition transcript including the following exchange following several allegations that defendants falsified Campbell's statement:
>   Q:  [. . .] It's fair to say that this is the information that Detectives Vorraro, and Bendig, and DeLuca provided to the DA regarding statements they claimed that you had [. . .] made when you were in custody is that right?
>   [DEFENDANTS' COUNSEL]:  Objection.
>   A:  (perusing document) Yeah.
>   Q:  And it's fair to say that based on the statements that you were shown, for example, where [Officer] Vorraro claims that you admitted that your brother ran into the house, and then came back outside with a gun, and just started shooting, with respect to those statements, you indicated they were, they were all false, right?
>   [DEFENDANTS' COUNSEL]:  Objection.
>   A:  Yes.
(RSMF ¶ 99, 100, 154, 155; Campbell Tr., JDTA Ex. 2, at 219:9-25.)

certain defendants falsely attributed to Campbell a statement
that the shooting had taken place outside the Residence. (*E.g.*,
RSMF ¶¶ 99, 100, 171, 178; Opp. at 7-10.) Plaintiffs' papers
are not a model of clarity in articulating the specific
statements plaintiffs contend were fabricated. Nevertheless,
the differences between, on the one hand, Campbell's version of
events and, on the other hand, the statements the court can
discern plaintiffs contend were fabricated, are exceedingly
minor from both a factual and a legal perspective, and thus do
not constitute genuine disputes of material fact.

### i.  *Statements in Bendig DD-5*

One instance in which a defendant purportedly
falsified a statement by Campbell comes in Detective Bendig's
DD-5, which memorializes his interview of Campbell at the 113th
Precinct on September 25, 2007, in relevant part as follows:

> [Campbell] further stated that [McClennon] ran
> into the front door of the house and Winston
> followed after him with the knife in his hand. .
> . . [Campbell] went on to say that as [McClennon]
> entered the front door of the house Winston
> tripped and fell onto the front stairs outside.
> [Campbell] stated that Winstons [sic] son then
> fell on top of Winston and then followed by
> himself.  [Campbell] stated he then heard Winston
> say No, No, No and then heard three shots.
> [Campbell] added that he looked up and saw

> [McClennon] pointing and shooting a gun at them
> from inside the open front door.

(DD-5, Fudim Decl. Ex. I, ECF No. 169-13, at 5.)[21]

The statement attributed to Campbell is not, as plaintiffs contend, a "statement about an unjustified shooting outside the home after Winston and Rasheel have [sic] already tripped and fallen," nor does it represent "the exact opposite of what Campbell told [Detective Bendig]." (RSMF ¶¶ 99-100.) Instead, it is largely consistent with the undisputed events of September 25, 2007. It is also largely consistent with Campbell's written statement, which was attached to the DD-5. (RSMF ¶ 101.)[22]

Comparing these statements, it is apparent that the only discrepancies are precisely where Winston fell, and when Rasheel and Campbell fell. According to Campbell's own written statement, Winston fell inside the house, not on the front steps, then McClennon fired a gun, then Rasheel and McClennon fell inside the house. (*See* Campbell Written Statement, Fudim Decl. Ex. G, ECF No. 169-11.) According to both statements,

---

[21] Several DD-5s are included within the same exhibit. As with the OCME documents, page number references in citations to Exhibit I to the Fudim Declaration, which contains the DD-5s, are to the page numbers generated by the ECF system.

[22] Plaintiffs purport to dispute defendants' assertion that "Bendig attached to the electronic DD-5 Campbell's written statement," but do so by stating "[f]alse," with no citation or explanation. (RSMF ¶ 101.) As noted above, this is not an acceptable way to controvert a statement in a Local Rule 56.1 statement, and defendants' assertion is deemed admitted. Additionally, the DD-5 itself indicates that Campbell's written statement is attached. (*See* DD-5, Fudim Decl. Ex. I, at 5.)

then, Winston was chasing McClennon with a knife, fell at or
near the front door, then McClennon fired a gun.  Additionally,
Campbell testified before the second grand jury that he saw
Winston chase McClennon with a knife and trip and fall just
inside the house such that "his shoes [were] just lined up with
the front door," then heard shots, then dove down to find
Winston already on the ground.  (Grand Jury 2 Tr., Fudim Decl.
Ex. E, ECF No. 169-9, at 90:4-91:13, 93:7-15.)

The record, therefore, reflects that any differences
between and among the accounts of the events of September 25,
2007, as set forth the (purportedly fabricated) DD-5, the
admittedly authentic written statement, and Campbell's
subsequent sworn statements are minor from both a factual and a
legal perspective.  On this record, no reasonable jury could
conclude that the discrepancies between the DD-5 and other
evidence rise to the level of falsification of evidence.

### ii.  Statements in 710.30(1)(a) Notices

Plaintiffs contend that there are two other incidents
where a defendant falsified a statement and attributed it to
Campbell.  The first is Officer Vorraro's statement to
prosecutors that "Campbell made the statements conveyed in the
710.30(1)(a) notice (about the shooting happening outside after
Winston and Rasheel had already fallen down outside)."  (Opp. at

8 n.4; *see also* Opp. at 8, 8 n.5 (citing, in relevant part, Plaintiffs' Ex. H, ECF Nos. 173-6 and 173-7).)

Plaintiffs do not cite to any particular portion of any 710.30(1)(a) notice. Instead, plaintiffs cite to an entire exhibit, which comprises 45 pages, is split across two ECF attachments, and contains several documents that are plainly not 710.30(a)(1) notices and/or expressly indicate that they relate to the first or second grand jury. (*See* Plaintiffs' Exhibit H, ECF Nos. 173-6 and 173-7). Based on a review of the entire 45-page exhibit, the purportedly fabricated statement of Campbell is as follows:

> You guys had knives. My brother ran into the house and came back out with a gun and started shooting. I didn't shoot them.

(710.30(1)(a) Notice, Plaintiffs' Ex. H, ECF No. 173-7, at 14.)[23]

The second instance of alleged fabrication of a statement by Campbell appears in the same 710.30(1)(a) Notice attributed to Campbell by Detective DeLuca. That statement is as follows: "They came here. I don't know why my brother Mike shot Winston. You'd have to ask him." (*Id.* at 14-15; *see also* Opp. at 9 (asserting that this statement, or a substantially similar one, was fabricated).)

---

[23] References to page numbers in citations to plaintiffs' Exhibit H are to the page numbers generated by the ECF system.

Plaintiffs' main evidence that these statements were fabricated consists of Campbell's denials that he made these statements.[24]  (Opp. at 8 n.5 (denying having made statement to Vorraro and citing, *inter alia*, Campbell Tr., JDTA Ex. 2, at 150:15-151:3); Opp. at 9 (denying having made statement to DeLuca and citing, *inter alia*, Campbell Tr. at 155:12-23).)  The court again notes that a plaintiff cannot rely solely on his own version of events to rebut the presumption of probable cause, and on this basis alone plaintiffs cannot rebut the presumption of probable cause based on the statements attributed to Campbell by Officer Vorraro and Detective DeLuca.

Further, with respect to the statement attributed to Campbell by Officer Vorraro, the court notes that at his deposition, Campbell did not take issue with any other aspects of Officer Vorraro's account, including, in relevant part, Campbell's purported statement that McClennon "shot them." (Campbell Tr. at 150:15-151:3.)  Instead, plaintiffs dispute only the words "came back out," which are not particularly significant from a factual or a legal standpoint.  Accordingly,

---

[24]     Plaintiffs also cite deposition testimony from Officer Vorraro in which Officer Vorraro states that he does not independently recall Campbell making certain statements to him.  (Opp. at 7-8 (citing Vorraro Tr., JDTA Ex. 4, at 130-34, 143-44).)  Officer Vorraro was deposed on May 16, 2016, well over eight years after the events of September 25, 2007.  (*See* Vorraro Tr. at 1.) Officer Vorraro's inability in 2016 to recall independently Campbell's purported statement, made in 2007, does not come anywhere near affirmatively establishing that Officer Vorraro fabricated Campbell's statement, nor does it corroborate Campbell's account.

even assuming plaintiffs could rely on Campbell's account of events to rebut the presumption of probable cause – which they cannot – their evidence is insufficient for a finding that Officer Vorraro fabricated a statement by Campbell.

### 3. *Cook and the CI's Accounts*

Plaintiffs also contend that defendants fabricated statements by Cook and the CI, but these contentions are unavailing.  Plaintiffs' papers lack clarity and do not specify which statements defendants purportedly fabricated and in what context.  Once again, plaintiffs do not direct the court to specific statements in the form of direct quotations and specific citations.  Plaintiffs instead largely offer their own characterizations of purportedly fabricated statements, which, as with plaintiffs' characterization of the statements in Detective Bendig's DD-5 as "precisely the opposite" of what Campbell said, are not always apt.  (*See*, *e.g.*, Opp. at 30 n.41 (characterizing statements attributed to Cook and asserting their falsity) and at 26-28 (characterizing statements attributed to the CI and asserting their falsity).)

Additionally, in at least three instances, plaintiffs assert that defendants fabricated statements by the CI and as support, cite to a video of his deposition, in its entirety, without any reference to the specific portion or portions of the video where the evidence establishing a fabrication is located.

(*See* Opp. at 28, 28 n.37 (citing, in its entirety, CI Deposition, Plaintiffs' Exhibit G); RSMF ¶ 165 (same).) The court declines to exercise its discretion to conduct an assiduous review of the record, including its discretion to review the entire video of the CI's deposition, in search of some unidentified evidence that might, when compared with other evidence, indicate that a genuine dispute of material fact exists for trial.

Having noted these issues with plaintiffs' submissions, plaintiffs appear to contend that defendants fabricated statements by Cook in an "Intake Report," and by Cook and the CI in separate DD-5s.

### i.   *Cook*

With respect to the purportedly fabricated statements attributed to Cook, plaintiffs cite to their Exhibit Z, in its entirety and without directing the court to the specific part of the exhibit that they contend contains a falsified statement. (Opp. at 29.) Plaintiffs' Exhibit Z, which they refer to as an "Intake Report" consists of 27 pages broken up across two ECF attachments. (*See* ECF Nos. 172-3 and 172-4.) As far as the court can discern, the only reference to Cook in the Intake Report is a statement by the Intake Report's preparer that Cook "saw the two perps with guns pointing them at the victims and he

heard gunshots." (Plaintiffs' Ex. Z, ECF No. 172-3, at 3.)[25]

Plaintiffs also refer to Detective Russo's DD-5, (RSMF ¶ 165),
according to which Cook stated that he saw both McClennon and
Campbell holding guns. (DD-5, Fudim Decl. Ex. I, ECF No. 169-
13, at 3.)

It is undisputed that Cook told police that he saw
McClennon and Campbell arguing with two men, (*see* RSMF ¶ 58),
and testified before the first two grand juries that he heard
two different guns fired. (RSMF ¶ 60.) Further, Cook testified
before the first grand jury that he saw Campbell holding what
appeared to be a gun (although Cook was not sure if it was a
gun). (Grand Jury 1 Tr., Fudim Decl. Ex. D, ECF No. 169-8 at
29:19-30:15). Cook also told the second grand jury that he saw
"the slender guy" holding "something [that] looked like a gun,"
although Cook did not expressly identify Campbell as the
"slender guy." (Grand Jury 2 Tr. at 7:25-9:4.)

There is thus only one discrepancy between Cook's
account of events as set forth in the DD-5 and Intake Report and
his account that he saw plaintiffs arguing with two men and
heard two different guns fired. Specifically, according to the
DD-5 and the Intake Report, Cook actually saw both McClennon and
Campbell with guns, but according to his later testimony, he saw

---

[25]   References to page numbers in citations to plaintiffs' Exhibit Z are to
the page numbers generated by the ECF system.

only Campbell with a gun, though he heard shots fired from two different guns.  This discrepancy is not sufficient for a reasonable jury to find bad faith fabrication.

Plaintiffs also cite to Detective DeLuca's deposition, (RSMF ¶ 165), but Detective DeLuca did not testify that he fabricated a statement, and plaintiffs do not offer the court any materials to which Detective DeLuca's deposition testimony should be compared.

### iii. *The CI*

With respect to the CI, plaintiffs assert that Detective Russo "fabricated information contained in his DD5, claiming [the CI] witnessed Richard Campbell pull a gun outside, before Winston drew a knife[], and fire shots at Winston from outside the home."  (Opp. at 32 n.43.)  Plaintiffs have submitted a DD-5 apparently prepared by Detective Russo following his interview with the CI.  (*See* Plaintiffs' Ex. Y, ECF No. 172-2.)[26]  In the DD-5, Detective Russo reports as follows:

> The witness states when this male [*i.e.*, Campbell] pulled out the gun the very older man, heavy set [*i.e.*, Winston] pulled out a very large knife from his waist.  The witness states the male with the gun and the male who threw the punch [*i.e.*, McClennon] began backing towards the front door of the house and the male with the knife approached the two males backing into the house.  The witness states the male with the gun

---

[26]     The same DD-5 is included at page 1 of Exhibit I to the Fudim Declaration.  (ECF No. 169-13.)

> fired once at the male with the knife then went
> into the house with the male who threw the punch.
> The witness states at this time the male with the
> knife ran in the house with the other man he was
> with.  The witness states he heard 4 or 5 gun
> shots.

(*Id.*)

As the court has noted, the CI's accounts of the events of September 25, 2007 have varied slightly, and any discrepancies between any one of the CI's statements and Detective Russo's DD-5 are no more significant than discrepancies between and among the CI's undisputed statements, for instance, at his deposition and before the second grand jury. (*See* Section Background - I.B (discussing, in relevant part, CI accounts).)

Additionally, the account relayed in Detective Russo's DD-5 is broadly consistent with the CI's testimony before the second grand jury.  (*See* Grand Jury 2 Tr. at 115:11-117:24 (including statements from CI that he saw the "old man," *i.e.* Winston, pull[] out a knife and the other low-hair guy," *i.e.* Campbell, "pull[] out a gun," and heard a series of gunshots when "they [we]re all towards the front of the house-way.").) On this record, no reasonable finder of fact could conclude that Detective Russo's DD-5 was fabricated.

Moreover, the CI himself testified before the third grand jury, (RSMF ¶ 190), and it is therefore unclear how

Detective Russo's DD-5 report of his interview of the CI could
have played a role in the procurement of plaintiffs'
indictments.

## C. Felony Complaint by DeLuca

Plaintiffs assert that Detective DeLuca "drafted the
felony complaint[s]" against them, and there is no dispute that,
at a minimum, Detective DeLuca reviewed and then signed the
felony complaints.  (RSMF ¶ 147.)  Plaintiffs do not, however,
come forward with any evidence upon which a reasonable jury
could conclude that Detective DeLuca acted in bad faith when he
drafted and/or signed the felony complaint.

Plaintiffs' papers make two assertions regarding the
criminal complaint's contents that could be relevant to bad
faith on Detective DeLuca's part in drafting and/or executing
it.[27]  Plaintiffs' memorandum of law asserts that "the felony
complaint seems to infer Rasheel was shot in the hand, when
De[L]uca knew from Dr. Elkowitz (the surgeon that treated
Rasheel's lacerated hand) that Rasheel had been stabbed- since
that is the information he conveyed to Lieutenant Kaiser."
(Opp. at 36 n.49.)  Additionally, plaintiffs' Local Rule 56.1

---

[27]     Plaintiffs also assert that "[t]he McClennon/Campbell family made a
complaint against DeLuca to his superiors in August 2007" regarding an
unrelated case and that Detective DeLuca "referenced this complaint during
arrest processing."  (Opp. at 37.)  Although this might be relevant as a
motive for bad faith conduct, it cannot save plaintiffs from the absence of
evidence that Detective DeLuca acted in bad faith in drafting and/or
reviewing the criminal complaint.

counter-statement contains a confusing assertion that "[d]espite knowing Rasheel's wound was not really a stab wound, De[L]uca drafted a felony complaint inferring the wound to Rasheel was the result of plaintiff's shooting at him."  (RSMF ¶ 40.)

Contrary to plaintiffs' assertions, however, the felony complaint does not "infer," or in any way suggest, that Rasheel was shot in the hand.  Instead, the complaint states that "the actions of [Campbell and McClennon] did cause [Rasheel] to sustain a laceration to the hand," and that "[Rasheel] did sustain a deep laceration to the left hand and did sustain ligament damage."  (Criminal Complaint, Fudim Decl. Ex. B, ECF No. 169-6, at 2-4.)  This is consistent with Rasheel's statements that both plaintiffs shot at him and Winston and that his hand was injured when he tried to help Winston, who had already been shot.  (RSMF ¶¶ 36-39.)

Plaintiffs' contentions regarding the references to Rasheel's injuries in the criminal complaint cannot suffice to show bad faith in the procurement of plaintiffs' indictments. Additionally, although not expressly asserted as a basis for a finding of bad faith with respect to the criminal complaint, for the reasons set forth above, no reasonable jury could find bad faith based on the weight the officers afforded Rasheel's account of events.  Thus, plaintiffs have not directed the court to any evidence that would establish bad faith on Detective

DeLuca's part when he prepared and/or signed the felony complaint against them.

Defendants are therefore entitled to summary judgment because plaintiffs have not come forward with evidence of bad faith conduct on the part of defendants, or any other officers, nor presented evidence that a genuine dispute of material fact remains to be tried.

## CONCLUSION

Plaintiffs' indictments created a rebuttable presumption of probable cause, and probable cause is a complete defense to a claim of malicious prosecution. To defeat defendants' motion for summary judgment, plaintiffs were required, but failed, to come forward with evidence based upon which a reasonable jury could conclude that plaintiffs' indictments by the third grand jury were procured by bad faith conduct on the part of defendants. Accordingly, defendants' motion for summary judgment is GRANTED in its entirety.

The Clerk of Court is respectfully requested to enter judgment in favor of defendants and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
      June 11, 2018

                                  _____/s/_____
                                  KIYO A. MATSUMOTO
                                  United States District Judge
                                  Eastern District of New York